EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Luis Oscar Santiago Montañez et al. Peticionarios v. Fresenius Medical Care et al. Recurridos | Certiorari 2016 TSPR 76 195 DPR ____ |
|---|---|

Número del Caso: CC-2013-986

Fecha: 6 de mayo de 2016

Tribunal de Apelaciones:

Región Judicial de Caguas

Abogados de la Parte Peticionaria:

Lcda. Maryse Roldán Ruiz
Lcdo. José F. Velázquez Ortiz

Abogados de la Parte Recurrida:

Lcdo. Antonio A. Arias Larcada
Lcdo. Alejandro J. Cepeda Díaz
Lcda. Isabel Torres Sastre

Materia: Daños y perjuicios. Estimación y valoración de daños. Se aumentan las cuantías de daños concedidas por el Tribunal de Primera Instancia a la luz de las cuantías otorgadas en casos similares anteriores y se aplican los aspectos metodológicos de valoración de daños establecidos en Rodríguez *et al.* v. Hospital *et al.*, 186 DPR 889 (2012).

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Luis Oscar Santiago Montañez *et al.* Peticionarios v. Fresenius Medical Care *et al.* Recurridos | CC-2013-986 | *Certiorari* |

Opinión del Tribunal emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 6 de mayo de 2016.

Este caso nos provee la oportunidad de reafirmar los postulados de estimación y valoración de daños que establecimos en Rodríguez *et al.* v. Hospital *et al.*, *infra*. Además, resulta imperativo llamar la atención a los foros primarios en torno a la necesidad de apegarse a los aspectos metodológicos esenciales aplicados en esta Opinión, en la difícil, pero vital gestión de valoración de daños.

Procedemos a exponer el contexto fáctico y procesal en el que se desató la cuestión planteada ante nos.

I

Tras ser diagnosticada con insuficiencia renal en su etapa terminal en noviembre de 2006, la Sra. Ruby Navarro

Santiago (señora Navarro Santiago) comenzó a recibir terapias de reemplazo renal mediante hemodiálisis, según recomendado por su nefrólogo, el Dr. Enrique Ortiz Kidd (doctor Ortiz Kidd).[1] Específicamente, en enero de 2007, comenzó a tomar las terapias de hemodiálisis en el centro de diálisis Fresenius Medical Care/Bio-Medical Applications of Caguas, Inc. (BMA Caguas). Ésta recibía el tratamiento tres veces por semana y cada terapia duraba aproximadamente de dos horas y media a tres horas y media cada una.

Como de costumbre, el 5 de septiembre de 2007, la señora Navarro Santiago acudió a BMA Caguas para recibir su tratamiento de hemodiálisis. Al arribar al centro con su cónyuge Luis Oscar Santiago Montañez (señor Santiago Montañez), quien siempre la llevaba a sus terapias, la señora Navarro Santiago fue recibida por una de las enfermeras de BMA Caguas, Irma I. Pedraza Ríos (enfermera Pedraza), quien estuvo a cargo de darle su terapia rutinaria de hemodiálisis. La referida enfermera comenzó

---

[1] Antes de comenzar sus terapias de hemodiálisis, la Sra. Ruby Navarro Santiago (señora Navarro Santiago) se sometió a una cirugía de construcción de una fístula arteriovenosa en su brazo izquierdo, toda vez que la fístula es el acceso vascular preferido para dar la terapia de hemodiálisis. Sin embargo, la fístula construida en su brazo izquierdo tuvo un fallo primario, por lo que ésta no se desarrolló o maduró lo suficiente como para ser utilizada en el tratamiento de hemodiálisis. Ante ello, se le implantó quirúrgicamente a la señora Navarro Santiago un catéter que eventualmente se utilizó como acceso vascular para su terapia de hemodiálisis.

la terapia realizando un procedimiento para absorber la

heparina[2] que se había dejado en los lúmenes de la señora

Navarro Santiago en su terapia anterior del 3 de

septiembre.[3] Empero, en el proceso de extracción de la

heparina, la enfermera sintió una obstrucción que impedía

el flujo. Ante tal situación, ésta aplicó solución salina

al catéter, pero continuó sintiendo resistencia para

remover la heparina, por lo que le informó sobre la

obstrucción a la enfermera líder Nilda Maldonado López

(enfermera Maldonado).

Resulta importante destacar que, para ese entonces,

existía un protocolo en BMA Caguas que disponía que en

estos casos de oclusión en los catéteres se debía insertar

el trombolítico Activase en los lúmenes para destruir los

coágulos y poder reanudar el proceso de hemodiálisis.[4]

Asimismo, el protocolo establecía que el personal de

---

[2]Heparina es un anticoagulante que evita la formación de coágulos o que, una vez formados los coágulos, hace que se expandan, pero no los destruye. Véase Sentencia del Tribunal de Primera Instancia de 23 de marzo de 2012, Apéndice del *certiorari*, pág. 65.

[3]Las enfermeras de BMA Caguas le inyectaban a la señora Navarro Santiago el fármaco heparina en los dos lúmenes del catéter al concluir cada terapia de hemodiálisis y le dejaban el anticoagulante en los lúmenes hasta la próxima terapia para evitar la formación de coágulos que impidieran que se efectuara la terapia subsiguiente.

[4]El fármaco Activase es un trombolítico que se utiliza para destruir o diluir los coágulos o trombos que obstruyen los catéteres instalados quirúrgicamente en los pacientes. Véase Sentencia del Tribunal de Primera Instancia de 23 de marzo de 2012, Apéndice del *certiorari*, pág. 64.

enfermería primero debía comunicarse con uno de los médicos del centro de diálisis para que alguno de éstos autorizara el uso del fármaco Activase. Una vez se obtenía la autorización de un médico, debían dejar el fármaco por 30 minutos y, luego, extraerlo y comenzar nuevamente la terapia de hemodiálisis. Ello, solo si el Activase había sido exitoso en destruir los coágulos o trombos que obstruían los catéteres.

Contrario al protocolo establecido por BMA Caguas y al estándar aceptado para atender las oclusiones en los catéteres, según expuesto por los peritos de las partes, la enfermera Maldonado no se comunicó con el doctor Ortiz Kidd, quien era el médico que estaba de guardia, para que autorizara el uso del Activase. En su lugar, ordenó que se le inyectaran 5000 unidades de heparina al catéter de la señora Navarro Santiago y que se le dejara el fármaco por 30 minutos. Posteriormente, la enfermera Pedraza continuó el proceso de diálisis que había quedado interrumpido por las oclusiones en el catéter de la señora Navarro Santiago. Nuevamente, ello se hizo sin que se le hubiese comunicado la situación al doctor Ortiz Kidd u otro médico y sin administrar el fármaco Activase, según requería el protocolo de BMA Caguas.

Como consecuencia, al poco tiempo de haber comenzado nuevamente la hemodiálisis, la máquina de dializar se detuvo sola por haber registrado una presión venosa

elevada. Eso significaba que la señora Navarro Santiago confrontaba problemas para recibir el retorno de su sangre desde la máquina hacia su cuerpo. Este problema en el retorno de sangre respondió a la obstrucción existente en el catéter y que no fue atendida correctamente al administrar la heparina. Ante la situación, la enfermera Maldonado le instruyó a la enfermera Pedraza que puncionara una vena periferal para devolverle a la señora Navarro Santiago la sangre que quedó atrapada en la máquina de dializar y por esa misma vena continuar la terapia de hemodiálisis que quedó interrumpida.[5]

Tanto la enfermera Pedraza como la enfermera Maldonado intentaron puncionar a la señora Navarro Santiago en varias ocasiones por distintos lugares de sus extremidades superiores, pero no tuvieron éxito. Así las cosas, contactaron a la enfermera Yolanda Delgado (enfermera Delgado), especialista en puncionar bebés, para que ésta puncionara a la señora Navarro Santiago. La

---

[5]Cabe resaltar que desde que la señora Navarro Santiago comenzó a recibir su tratamiento de hemodiálisis en BMA Caguas nunca habían intentado devolverle sangre o realizar la hemodiálisis por una vena periferal. Siempre que hubo complicaciones por oclusiones en los catéteres se intentaba corregir el problema con el Activase. De no solucionarse el problema de oclusión, se suspendía la terapia de inmediato y se le enviaba a la sala de emergencias del hospital HIMA San Pablo de Caguas para que se reemplazara el catéter y se continuara allí la terapia utilizando el nuevo catéter. De hecho, a la señora Navarro Santiago se le reemplazaron más de una veintena de catéteres disfuncionales, por lo que las enfermeras de BMA Caguas debían estar familiarizadas con el curso de acción que se tomaba cuando la paciente confrontaba problemas de oclusión en su catéter.

enfermera Delgado puncionó la vena cefálica del brazo izquierdo de la paciente, la que había sido utilizada para construir la fístula que nunca maduró, y al encontrar retorno de sangre en esa vena tomó la línea de la máquina con un clavo o angio #14[6] y se lo insertó para devolverle la sangre que quedó atrapada en la máquina. Como corolario, la señora Navarro Santiago sufrió una infiltración o extravasación de sangre en su brazo izquierdo, por lo que el área de la punción comenzó a edematizarse.

Una vez las enfermeras se percataron de la hinchazón en el área de la punción, apagaron la máquina de dializar y removieron el clavo insertado. Acto seguido, la señora Navarro Santiago comenzó a sangrar. Para detener el sangrado, le hicieron presión al área del brazo por espacio de 30 minutos, le colocaron compresas de hielo y un torniquete de presión encima de la venda. Fue para ese entonces que la enfermera Maldonado trató infructuosamente de comunicarse con varios médicos del centro. Cuando finalmente conversó con el doctor Ortiz Kidd, solo le informó de la oclusión en el catéter de la señora Navarro Santiago, por lo que éste ordenó que se administrara el Activase por 30 minutos.

---

[6]El angio #14 es la aguja de mayor diámetro utilizada para la hemodiálisis en pacientes con fístulas arteriovenosas.

La enfermera Maldonado le ocultó al doctor Ortiz Kidd la infiltración que provocó el edema y el sangrado en el brazo izquierdo de la paciente. Ésta administró el Activase y refirió a la señora Navarro Santiago a otra enfermera. Para ese momento, la infiltración se extendía desde el codo hacia el hombro del brazo izquierdo. Posteriormente, la señora Navarro Santiago se defecó en dos ocasiones en el sillón donde estaba recibiendo el tratamiento y se quejaba de dolor severo en su brazo.

La señora Navarro Santiago pidió que llamaran a su cónyuge. Según lo establece en sus determinaciones de hechos el Tribunal de Primera Instancia, el señor Santiago Montañez pudo escuchar a su cónyuge gritar del dolor, por lo que salió de inmediato hacia el área de diálisis. Asimismo, el foro primario determinó que las enfermeras de BMA Caguas conocían que la condición de la señora Navarro Santiago era una de emergencia y sospechaban que ésta había sufrido un síndrome de compartimiento, o al menos que existían indicios de ello. Aún así, el centro no gestionó los servicios de una ambulancia para trasladarla a la sala de emergencias. Un paramédico que escuchó a la paciente gritando de dolor y vio al señor Santiago Montañez desesperado por la situación, le ofreció sus servicios. El foro primario también creyó la versión del señor Santiago Montañez, quien indicó que BMA Caguas se negó a firmar para que el paramédico pudiera ofrecer los

servicios de ambulancia sin que ello representara un costo para la paciente. Ante la negativa del centro, el señor Santiago Montañez asumió el costo del servicio y solicitó que la señora Navarro Santiago fuera trasladada al Hospital HIMA San Pablo de Caguas (HIMA de Caguas).

La paciente llegó a HIMA de Caguas con hemorragia activa en su brazo izquierdo y deshidratación. El cirujano periferal Dr. Luis Aponte (doctor Aponte) atendió a la señora Navarro Santiago en la sala de emergencias y, posteriormente, le diagnosticó el síndrome de compartimiento.[7] Para ese entonces, la paciente había perdido movimiento en la extremidad, estaba rígida y el dolor había aumentado. De esperar más tiempo, ésta se exponía a sufrir daño severo en los nervios del brazo, pues la sangre no fluía adecuadamente hacia esa extremidad. En consecuencia, el doctor Aponte tuvo que someter a la paciente a una cirugía de fasciotomía en su brazo izquierdo.[8] El foro primario consideró como hecho

_____

[7]El síndrome de compartimiento es una afección seria que implica que ha ocurrido un aumento de la presión en un compartimiento muscular. Puede ocasionar daños en los nervios y músculos, al igual que problemas con el flujo sanguíneo. El Dr. Luis Aponte (doctor Aponte) señaló en su testimonio que ello puede causar isquemia o muerte del tejido y, por tanto, resultar en la amputación de la extremidad.

[8]Según explicó el doctor Aponte en su testimonio, la fasciotomía es una incisión que se hace en la fascia, que es el tejido del brazo, que reviste el compartimiento donde están los músculos y vasos sanguíneos. Con la incisión se libera la presión que existe dentro de ese compartimiento, la fascia del músculo se brota hacia afuera, para así restaurar el flujo sanguíneo. Así, pues,

probado que la sangre coagulada que encontró el doctor Aponte al realizar la fasciotomía provino de la vena cefálica que puncionó la enfermera Delgado.

Al día siguiente, el 6 de septiembre de 2007, la señora Navarro Santiago también sufrió un episodio severo de hipoglucemia con un nivel de azúcar en la sangre de 7 mg/dL,[9] un fallo respiratorio que requirió entubación endotraqueal y una encefalopatía anóxica.

Luego de estos incidentes, y por los próximos 40 días de su hospitalización, la señora Navarro Santiago sufrió una pulmonía y entró en un aparente estado de coma. Durante ese tiempo, contrajo varias infecciones y otras complicaciones que tuvieron que ser tratadas por médicos de distintas especialidades. Al cabo de dos meses, la señora Navarro Santiago fue dada de alta del hospital HIMA de Caguas, pero tuvo que ser admitida en varias ocasiones en los meses subsiguientes. Conforme a las determinaciones de hechos del foro primario, ésta regresó a su hogar sumamente delicada de salud, tenía instalada una traqueotomía que le ayudaba a respirar y permaneció encamada hasta su fallecimiento. Del mismo modo, el referido foro determinó que la llegada de la señora Navarro Santiago a su hogar ocasionó un cambio notable en su familia. Así, por ejemplo, su hijo Luis Joel Santiago

_____

cuando se libera la presión aumenta el flujo sanguíneo hacia la extremidad y evita que desarrolle gangrena.

[9] El nivel normal mínimo de azúcar en la sangre es 110 mg/dL.

Navarro y su nuera Rosalí Flores Rodríguez tuvieron que mudarse al hogar de la señora Navarro Santiago para atenderla mientras el señor Santiago Montañez trabajaba. Ello, toda vez que la señora Navarro Santiago no podía valerse por sí misma.

Según los hechos que el foro primario entendió probados, antes de los incidentes acaecidos el 5 de septiembre de 2007, la señora Navarro Santiago era activa, hacía los quehaceres de su hogar y, dentro de su condición, tenía una vida normal. Después de esa fecha, ella era otra persona. Particularmente, el Tribunal de Primera Instancia concluyó que "la disminución en sus funciones, con motivo del síndrome de compartimiento y la cirugía posterior, su encefalopatía anóxica, pulmonía y otras complicaciones, fueron huellas indelebles que perduraron hasta su fallecimiento" el día 24 de abril de 2008. Véase Sentencia del Tribunal de Primera Instancia de 23 de marzo de 2012, Apéndice del *certiorari*, pág. 79. De igual forma, le resultó evidente al tribunal sentenciador que, aún cuando ninguno de los peticionarios fue a un psicólogo o psiquiatra, éstos demostraron "el débito emocional que han dejado en ellos los eventos suscitados en [BMA Caguas], aquellos ocurridos por espacio de más de dos meses [mientras la señora Navarro Santiago se encontraba hospitalizada] en HIMA [de] Caguas y en los [cinco] meses que siguieron". Íd.

El referido foro indicó no tener dudas de que todos los peticionarios "fueron y se encuentran emocionalmente afectados de una manera permanente, no pasajera". Íd. Ello, toda vez que con su testimonio demostraron lo estrecha que era su relación familiar con la señora Navarro Santiago y su sufrimiento al escuchar cómo ésta les imploraba que la ayudaran.

El 26 de febrero de 2010[10] los familiares de la señora Navarro Santiago (peticionarios) presentaron una demanda en daños y perjuicios contra BMA Caguas, su compañía aseguradora y otros (recurridos).[11] En ésta, solicitaron que se le ordenara a los recurridos pagar solidariamente

---

[10] El 5 de septiembre de 2008 se presentó una demanda ante el Tribunal de Primera Instancia por estos mismos hechos. No obstante, el 27 de febrero de 2009, los peticionarios presentaron una moción solicitando el desistimiento sin perjuicio de la causa de acción. Así las cosas, el 6 de marzo de 2009, el referido foro dictó una *Sentencia* decretando el desistimiento sin perjuicio. Ese dictamen se notificó el 12 de marzo de 2009.

[11] Los familiares demandantes son los siguientes: el Sr. Luis Oscar Santiago Montañez, sus hijos Luis Joel Santiago Navarro y Luis Oscar Santiago Navarro, sus cónyuges Rosalí Flores Rodríguez y Yarelis Vázquez, respectivamente, y las sociedades legales de gananciales constituidas entre éstos.

Por su parte, los demandados son los siguientes: el Dr. Rafael Baquero, su compañía aseguradora y la sociedad legal de gananciales constituida entre éste y su cónyuge; el Dr. Enrique Ortiz Kidd, su compañía aseguradora y la sociedad legal de gananciales constituida entre éste y su cónyuge; el Dr. José Ayala, su compañía aseguradora y la sociedad legal de gananciales constituida por éste y su cónyuge; el Dr. Moisés Villalobos, su compañía aseguradora y la sociedad legal de gananciales constituida por éste y su cónyuge; la Dra. Eugenia Galindo, su compañía aseguradora y la sociedad legal de gananciales constituida por ésta y su cónyuge. También se incluyó en la demanda a Richard Doe como demandado desconocido.

la cuantía de $1,000,000 por los daños morales y angustias mentales sufridas por la señora Navarro Santiago. Asimismo, reclamaron $1,000,000 por los daños sufridos por el viudo, Sr. Luis Oscar Santiago Montañez; $500,000 para cada uno de sus hijos, Luis Joel Santiago Navarro y Luis Oscar Santiago Navarro, y $250,000 para cada nuera.

Tras aquilatar la prueba presentada por las partes, el 23 de marzo de 2012, el Tribunal de Primera Instancia dictó una *Sentencia* en la cual declaró ha lugar la demanda instada por los peticionarios. En consecuencia, ordenó a BMA Caguas y a su aseguradora[12] a compensar al señor Santiago Montañez por la suma de $40,000 por sus sufrimientos y angustias mentales; a cada uno de los hijos por la suma de $15,000 por sus sufrimientos y angustias mentales; a una de las nueras por la suma de $15,000 y a la otra nuera por la suma de $10,000. Asimismo, ordenó el pago de $35,000[13] por los daños físicos y emocionales sufridos por la señora Navarro Santiago.

Inconformes, el 4 de mayo de 2012, los peticionarios acudieron al Tribunal de Apelaciones mediante un *Recurso de Apelación*. En éste, solicitaron que se modificara el

---

[12]El 2 de diciembre de 2011 el Tribunal de Primera Instancia dictó una *Sentencia Parcial* en la que consignó el desistimiento voluntario con perjuicio solicitado por los peticionarios en cuanto a los médicos incluidos en la demanda, sus sociedades de gananciales y sus respectivas aseguradoras.

[13]Al adjudicar los daños físicos y emocionales sufridos por la señora Navarro Santiago, el foro primario expresó que tomó en consideración que la paciente estuvo en coma alrededor de 40 días.

dictamen emitido por el foro primario en cuanto a las cuantías de daños concedidas a cada peticionario por los distintos conceptos. Ello, por entender que éstas son ridículamente bajas al amparo de las determinaciones de hechos y conclusiones de derecho contenidas en el dictamen recurrido. Además, arguyeron que erró el foro primario al determinar las cuantías sin ceñirse a los criterios establecidos en la jurisprudencia aplicable en torno a la valoración de los daños en nuestro ordenamiento. El 5 de diciembre de 2012 los peticionarios presentaron un alegato suplementario.

En oposición al alegato suplementario, los recurridos presentaron un alegato en el que adujeron, en síntesis, que procedía confirmar o disminuir las cuantías concedidas por el foro primario. Además, alegaron que ese foro erró al incluir al señor Santiago Montañez en la cuantía otorgada por los daños que sufrió su cónyuge antes de morir. Así, éstos argumentaron que el viudo no es propiamente un heredero de la causante, por lo que no tiene un derecho hereditario sobre la causa de acción que su cónyuge no ejerció en vida.

Examinados los escritos de las partes, el 15 de octubre de 2013, el Tribunal de Apelaciones emitió una *Sentencia* mediante la cual confirmó lo dictaminado por el foro primario con relación a las cuantías concedidas a los peticionarios. No obstante, en lo que concierne a la

partida por los daños que sufrió la señora Navarro Santiago antes de morir, acogió el planteamiento de los recurridos. En consecuencia, modificó la sentencia emitida por el Tribunal de Primera Instancia a los efectos de excluir al señor Santiago Montañez de la partida por los daños heredados.[14]

En desacuerdo, el 18 de noviembre de 2013, los peticionarios recurrieron ante este Tribunal. Arguyen que erró el Tribunal de Apelaciones al determinar que el cónyuge supérstite no es un heredero propiamente y, por tanto, excluirlo de la partida por los daños sufridos por su cónyuge antes de fallecer.[15] Asimismo, aducen que erró el referido foro al confirmar las cuantías concedidas por

_____

[14]El Juez Troadio González Vargas emitió una Opinión Disidente en la que expuso, en esencia, que no le correspondía al foro apelativo intermedio pasar juicio sobre la participación del cónyuge viudo en la partida de daños heredados. Ello, toda vez que los recurridos presentaron este planteamiento por primera vez en su alegato en oposición al alegato suplementario instado por los peticionarios. El Juez González Vargas entendió que los recurridos debieron traer el asunto ante la consideración del Tribunal de Apelaciones mediante el correspondiente recurso de apelación.

[15]Con relación a este señalamiento de error, los peticionarios argumentan que el foro apelativo intermedio se inmiscuyó en un asunto que no se le planteó y para lo cual carecía de jurisdicción, según explicado por el Juez Troadio Gónzalez Vargas en su disidencia. En lo que concierne a esta cuestión procesal, no podemos obviar las particularidades de este caso en que los recurridos plantearon el asunto ante el Tribunal de Apelaciones. Además, en casos apropiados, "un tribunal apelativo tiene la facultad inherente de considerar y resolver errores patentes que surjan de un recurso aun cuando éstos no hayan sido presentados por las partes". Véanse: ELA v. Northwestern Selecta, 185 DPR 40, 55 (2012); SLG Flores-Jiménez v. Colberg, 173 DPR 843, 851 (2008); Hernández v. Espinosa, 145 DPR 248, 264 (1998).

el Tribunal de Primera Instancia a los peticionarios, toda vez que procedía aumentarlas por ser ridículamente bajas.

En respuesta, los recurridos sostienen que la valoración de daños realizada por el foro primario fue razonable a la luz de sus determinaciones de hechos, por lo que no ameritaba que el foro apelativo intermedio interviniera con su dictamen. Además, arguyen que lo expresado por el Tribunal de Apelaciones en cuanto a la exclusión del cónyuge viudo de la partida de daños heredados constituyó, en todo caso, *obiter dictum*.

Así las cosas, el 28 de marzo de 2014, expedimos el recurso ante nuestra consideración. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver conforme a derecho.

## II

Nuestro ordenamiento jurídico reconoce que el derecho de indemnización de un causante al amparo del Art. 1802 del Código Civil de Puerto Rico, por los daños y perjuicios sufridos durante su vida, es un bien patrimonial transmisible a sus herederos y reclamable por éstos como parte de su herencia legítima. Vda. de Delgado v. Boston Ins. Co., 101 DPR 598, 607 (1973). Véanse también: Blás v. Hosp. Guadalupe, 146 DPR 267, 350-351 (1998); Consejo de Titulares v. CRUV, 132 DPR 707, 731-733 (1993); Publio Díaz v. ELA, 106 DPR 854, 871-872 (1978); Arts. 608 y 610 del Código Civil de Puerto Rico, 31 LPRA

secs. 2090 y 2092. Sabido es que la legítima se refiere a la porción de bienes que el testador no puede disponer por haber sido reservada por la ley a determinados herederos, quienes son llamados herederos forzosos. Art. 735 del Código Civil de Puerto Rico, 31 LPRA sec. 2361.

Con relación a lo anterior, es menester señalar que el Art. 736 del Código Civil, 31 LPRA sec. 2362, designa al viudo como uno de los llamados a suceder al causante a título de heredero forzoso. En virtud de este precepto estatutario, desde hace más de seis décadas, dejamos meridianamente claro que en nuestra jurisdicción el cónyuge viudo es un heredero forzoso. Así, en Luce & Co. v. Cianchini Vda. De Santiago, 76 DPR 165, 172 (1954), expresamos diáfanamente que el cónyuge supérstite es un heredero forzoso al que la ley separa una cuota usufructuaria que constituye su legítima. Véase, además: E. González Tejera, Derecho de Sucesiones, T. I, San Juan, Editorial de la UPR, 2001, pág. 101. Ello es así aunque el disfrute de su participación hereditaria esté sustancialmente limitado, toda vez que recibe bienes del caudal hereditario en usufructo y no en pleno dominio, como ocurre con otros herederos legitimarios. Íd. Desde entonces, hemos reiterado ese carácter de heredero forzoso que le confiere el Art. 736 de nuestro Código al cónyuge supérstite.

Así lo pronunciamos en Díaz Lamoutte v. Luciano, 85 DPR 834 (1962), en ocasión de evaluar el alcance de unas cláusulas testamentarias que condicionaban el derecho legitimario que posee la viuda como heredera forzosa. Asimismo, en González de Salas v. Vda. de González, 99 DPR 577 (1971), reafirmamos el carácter de heredero forzoso del cónyuge viudo en el contexto del retracto de coherederos, para aclarar que la viuda no es una extraña en la herencia de su fenecido cónyuge. Más adelante, en Ripoll v. Pagán, 121 DPR 1, 10-11 (1988), indicamos que un cónyuge adquiere derechos sobre la sucesión de su cónyuge difunto y que éstos interfieren con los derechos de todos aquellos hijos que existan, pues la ley considera al viudo un heredero forzoso. En Ab Intestato Saldaña Candelario, 126 DPR 640 (1990), también recalcamos que el cónyuge viudo es un heredero forzoso, al concluir que los cónyuges que optan por regir su matrimonio por el régimen económico de separación de bienes no pueden renunciar al derecho de usufructo viudal. Finalmente, en Moreda v. Rosselli, 141 DPR 674 (1996), enunciamos que es norma reiterada que el cónyuge viudo es un heredero forzoso, siendo su legítima la cuota viudal usufructuaria.

## III

Por otra parte, reiteradamente hemos expresado que los tribunales revisores no debemos intervenir con las determinaciones de los foros de primera instancia, salvo

que medie pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba. Dávila Nieves v. Meléndez Marín, 187 DPR 750, 753 (2013); Rodríguez et al. v. Hospital et al., 186 DPR 889, 908-909 (2012); Serrano Muñoz v. Auxilio Mutuo, 171 DPR 717, 741 (2007); Álvarez v. Rivera, 165 DPR 1, 25 (2005). En lo atinente a las acciones de daños y perjuicios, hemos reconocido que la tarea judicial de estimar y valorar los daños resulta difícil y angustiosa, debido a que no existe un sistema de computación que permita llegar a un resultado exacto con el cual todas las partes queden complacidas y satisfechas. Rodríguez et al. v. Hospital et al., supra, pág. 909; Herrera, Rivera v. SLG Ramírez Vicéns, 179 DPR 774, 784 (2010); Publio Díaz v. ELA, supra, pág. 867; Urrutia v. AAA, 103 DPR 643, 647 (1975). Es por ello que establecimos que los tribunales apelativos no deben intervenir con la valoración de daños que realiza el foro primario, salvo cuando la cuantía concedida resulte ridículamente baja o exageradamente alta. Meléndez Vega v. El Vocero de PR, 189 DPR 123, 203 (2013); Rodríguez et al. v. Hospital et al., supra, pág. 909; Herrera, Rivera v. SLG Ramírez Vicéns, supra, págs. 784-785; Publio Díaz v. ELA, supra, pág. 868; Urrutia v. AAA, supra, págs. 647-648. Ello, toda vez que ese ejercicio de valoración de daños involucra cierto grado de especulación y elementos subjetivos, tales como la discreción y el sentido de justicia y conciencia humana

del juzgador de los hechos. Herrera, Rivera v. SLG Ramírez Vicéns, *supra*, pág. 785; Publio Díaz v. ELA, *supra*, págs. 867-868; Urrutia v. AAA, *supra*, pág. 647. Además, es el foro primario el que tiene contacto directo con la prueba testifical presentada y, por ende, está en mejor posición de emitir un juicio sobre la valorización de daños. Rodríguez *et al.* v. Hospital *et al.*, *supra*, pág. 909; Herrera, Rivera v. SLG Ramírez Vicéns, *supra*, pág. 785.

De igual modo, hemos destacado que para evaluar si la compensación concedida por el Tribunal de Primera Instancia es ridículamente baja o exageradamente alta, debemos examinar la prueba desfilada ante ese foro y las cuantías otorgadas en casos similares resueltos anteriormente. Íd. En ese sentido, concluimos que las indemnizaciones concedidas en casos anteriores constituyen un punto de partida y referencia útil para pasar juicio sobre las concesiones otorgadas por el foro primario. Rodríguez *et al.* v. Hospital *et al.*, *supra*, págs. 909-910; Herrera, Rivera v. SLG Ramírez Vicéns, *supra*, pág. 785. Ello es así aun cuando reconocemos que no existen dos casos exactamente iguales y que cada caso es distinguible según sus circunstancias particulares. Íd. En todo caso, estas compensaciones otorgadas en casos anteriores deben ajustarse a su valor presente. Meléndez Vega v. El Vocero de PR, *supra*, pág. 204; Rodríguez *et al.* v. Hospital *et*

*al.*, *supra*, pág. 910; <u>Herrera, Rivera v. SLG Ramírez Vicéns</u>, *supra*, pág. 785.

**IV**

Como expresamos, los peticionarios acuden ante nos, en primer lugar, para que revoquemos la Sentencia emitida por el Tribunal de Apelaciones, mediante la cual se modificó el dictamen del tribunal sentenciador para excluir al señor Santiago Montañez de la partida de $35,000 por los daños que sufrió la señora Navarro Santiago. El foro intermedio entendió que éste no es un "heredero propiamente" en el caudal hereditario de su cónyuge.

En cuanto a este asunto, declaramos que la normativa jurídica que hemos expuesto es clara en reconocer el carácter de heredero forzoso del cónyuge supérstite. Hemos sido enfáticos en expresar que el cónyuge viudo tiene una participación en el caudal hereditario de su cónyuge difunto a título de heredero forzoso, cuya legítima constituye el usufructo viudal. En consecuencia, resolvemos que el Tribunal de Apelaciones erró al modificar el dictamen emitido por el foro primario a los efectos de excluir al señor Santiago Montañez de la partida concedida por concepto de daños heredados.

Atendido el primer señalamiento de error, procedemos a considerar el planteamiento de los peticionarios en

torno a la valoración de daños realizada por el tribunal sentenciador.

## V

Como indicamos, los peticionarios recurren ante este Tribunal para que aumentemos las cuantías concedidas por el Tribunal de Primera Instancia, confirmadas por el foro apelativo intermedio, por entender que son ridículamente bajas. El foro primario concedió a los peticionarios una partida de $35,000 por los daños que sufrió la señora Navarro Santiago antes de morir. Asimismo, concedió a su cónyuge una partida de $40,000 por sus sufrimientos y angustias mentales. Además, otorgó una partida de $15,000 a cada uno de sus hijos y a una de sus nueras. Finalmente, concedió $10,000 a la otra nuera. En consideración a este segundo señalamiento de error, nos corresponde evaluar si el foro primario erró en la estimación y valoración de daños. Veamos.

En lo que concierne a la metodología utilizada por el foro primario para establecer estas cuantías, el referido foro expresó haber efectuado un análisis de aquellos casos que más se asemejan al presente caso. Asimismo, manifestó haber aplicado los criterios establecidos en Herrera, Rivera v. SLG Ramírez Vicéns, *supra,* para la valoración de daños. No obstante, llama nuestra atención que el foro primario no mencionó en su dictamen cuáles son los casos similares que utilizó como

guía. Tampoco explicó cuál fue el cómputo que realizó para determinar las cuantías que concedió.

Ante ello, nos vemos obligados a advertir a los jueces y las juezas sobre la importancia de detallar en sus dictámenes los casos que se utilicen como referencia o punto de partida para la estimación y valoración de daños y el cómputo realizado para establecer las cuantías que se concedan. Este llamado a los jueces cobra importancia ante la necesidad imperante de instruir a las partes y a los miembros de la profesión jurídica en torno al método que se utiliza en ese difícil y angustioso proceso de estimar y valorar los daños. Además, habida cuenta de que esa tarea lleva consigo cierto grado de especulación, resulta forzoso explicar qué casos se utilizan como referencia y cómo se ajustan las cuantías concedidas en esos casos anteriores al caso que el tribunal tiene ante su consideración.

En este caso, resultaba de particular importancia que el foro primario expusiera de forma específica los casos similares utilizados y los cómputos realizados para ajustar las cuantías allí concedidas al valor presente. Ello responde a que, a nuestro juicio, las cuantías concedidas no encuentran apoyo en los hechos que ese foro entendió probados. Abundemos.

De un análisis sosegado de la prueba desfilada ante el Tribunal de Primera Instancia, y del expediente que

obra en autos, se desprende que debemos otorgar deferencia a las determinaciones de hechos realizadas por el referido foro.

Precisamente, destacamos que a lo largo de sus 125 determinaciones de hechos, el foro primario expresó que las actuaciones y omisiones negligentes de los recurridos fueron la causa del **deterioro abismal** de salud que sufrió la señora Navarro Santiago desde los hechos ocurridos el 5 de septiembre de 2007 hasta su fallecimiento. De igual modo, catalogó los daños ocasionados a la señora Navarro Santiago como una "**catástrofe**".

En cuanto a la catástrofe que ésta sufrió, el foro primario determinó, entre otras cosas, lo siguiente: que la señora Navarro Santiago contrajo pulmonía y tuvo que ser tratada por varias infecciones y complicaciones durante los 71 días que estuvo hospitalizada; que posteriormente tuvo que ser admitida al hospital en varias ocasiones; que fue dada de alta del hospital, pero regresó a su hogar encamada y jamás volvió a caminar; que salió del hospital sumamente delicada de salud, con una traqueotomía que le ayudaba a respirar; que su hijo Luis Joel y su nuera Rosalí tuvieron que mudarse al hogar de la señora Navarro Santiago y su cónyuge para ayudar con su cuidado.

Del mismo modo, dictaminó que a pesar de ser paciente de hemodiálisis y tener ciertas condiciones de salud, la

señora Navarro Santiago tenía una expectativa de vida de al menos 4 ó 5 años más; que su expectativa de vida se acortó de forma dramática por el quebranto de salud provocado a raíz de los hechos ocurridos el 5 de septiembre de 2007; que antes de esa fecha la señora Navarro Santiago era una persona activa, que hacía las tareas del hogar y que, dentro de su condición, tenía una vida normal; que después de esa fecha era otra persona; que tanto la disminución en sus funciones, con motivo del síndrome de compartimiento y la posterior cirugía de fasciotomía, como su encefalopatía anóxica, el fallo respiratorio y las otras complicaciones que sufrió, fueron huellas indelebles que perduraron hasta su fallecimiento; y que los peticionarios se encontraban emocionalmente afectados de forma permanente, no pasajera, aunque ninguno fue a un psicólogo o psiquiatra.

Empero, el tribunal sentenciador concede a los peticionarios unas sumas por concepto de daños que son irrisorias y ridículamente bajas, apartándose así de sus propias determinaciones de hechos. Éste intenta justificar las cuantías concedidas indicando que consideró unos casos que se asemejan y lo dispuesto en Herrera, Rivera v. SLG Ramírez Vicéns, *supra*. Sin embargo, un examen de las compensaciones otorgadas en casos similares anteriores y la aplicación de la norma prevaleciente en materia de estimación y valoración de daños demuestran que las

cuantías concedidas por el foro primario son ridículamente bajas. Discutamos primeramente el método de valoración de daños aplicable.

En Herrera, Rivera v. SLG Ramírez Vicéns, *supra*, acogimos el método que recomendó el ex juez Antonio Amadeo Murga (Amadeo Murga) para actualizar al valor presente las compensaciones otorgadas en casos similares anteriores. Véase: A.J. Amadeo Murga, El valor de los daños en la responsabilidad civil, 1ra ed., San Juan, Ed. Esmaco, 1997, T. I, págs. 91-126. Conforme a ese método, utilizamos el cambio en el poder adquisitivo del dólar a través del tiempo para obtener el ajuste por inflación. Íd., pág. 92. A su vez, el valor adquisitivo del dólar lo obtuvimos del índice de precios al consumidor que prepara el Departamento del Trabajo y Recursos Humanos (Departamento del Trabajo).[16] Obtenido el ajuste por inflación, realizamos un ajuste adicional por el crecimiento económico ocurrido entre el año del caso que se utiliza como referencia y el año en que se dictó sentencia en el caso que teníamos ante nuestra consideración. Íd., págs. 102-105.

---

[16]El índice de precios al consumidor está basado en los precios al consumidor de una canasta de bienes y servicios que consumen los ciudadanos del País y a base del promedio total de los bienes y servicios que se incluyen en esa canasta se determina el valor adquisitivo del dólar. Continuamente se recopilan los cambios en los precios de los artículos contenidos en la canasta para determinar el aumento en el nivel de precios. A.J. Amadeo Murga, El valor de los daños en la responsabilidad civil, 2da ed., España, Librería Bosch, 2012, pág. 70.

En aquel entonces, el método propuesto por Amadeo Murga aplicaba el índice de precios al consumidor que utilizaba como base el 1984. Sin embargo, en el 2009, el Departamento del Trabajo adoptó un nuevo índice de precios al consumidor que utiliza como base el 2006.[17] En la nueva edición de su libro, Amadeo Murga desfavorece el uso del nuevo índice. Éste indica que de acuerdo al nuevo índice el costo de vida resulta más bajo en Puerto Rico que en los Estados Unidos, lo que considera es contrario a la realidad. A.J. Amadeo Murga, El valor de los daños en la responsabilidad civil, 2da ed., España, Librería Bosch, 2012, págs. 71-72. En su lugar, Amadeo Murga recomienda utilizar el índice que representa el producto bruto per cápita. Íd., pág. 72. No obstante, éste indica que si se desea continuar utilizando los índices de precios al consumidor para ajustar las compensaciones, debe utilizarse la tabla de índices de precios al consumidor y ajustar el aumento en el nivel de vida utilizando la tabla de ingreso personal per cápita a precios constantes de 1954. Íd.

Recientemente, en Rodríguez *et al.* v. Hospital *et al.*, *supra*, reconocimos que no hay consenso entre los expertos en el tema en torno al método a utilizarse para

---

[17]Las tablas estadísticas que proveen el nuevo índice de precios al consumidor por año están disponibles en la página cibernética del Departamento del Trabajo: http://www.mercadolaboral.pr.gov/Tablas_Estadisticas/Otras_Tablas/T_Indice_Precio.aspx (última visita 5 de mayo de 2016).

actualizar compensaciones concedidas en el pasado y optamos por acoger el método que utiliza el índice de precios al consumidor con el 2006 como año base. Íd., pág. 914. Empero, rechazamos realizar el ajuste que recomendó Amadeo Murga y adoptamos la postura del Prof. José Julián Álvarez González, quien desfavorece que se haga un ajuste adicional por el crecimiento económico cuando se utiliza el nuevo índice de precios al consumidor. Véase: J.J. Álvarez González y L.M. Pellot Juliá, Responsabilidad Civil Extracontractual, 81 Rev. Jur. UPR 661 (2012). Así, concluimos que cuando utilizamos un índice de precios al consumidor cuyo año base es reciente es innecesario realizar el ajuste que señala Amadeo Murga como segunda parte del proceso de actualización de las partidas concedidas. Rodríguez et al. v. Hospital et al., supra, pág. 914. Asimismo, establecimos que si del proceso de actualización resultan cuantías que consideramos muy bajas, puede responder a que las partidas concedidas en el pasado también eran muy bajas, por lo que procedería aumentar la indemnización a concederse si las circunstancias particulares del caso lo justifican. Íd., pág. 915. Véase también: Álvarez González y Pellot Juliá, supra, págs. 678-679.

Como mencionamos, el foro primario aduce que siguió el procedimiento que adoptamos en Herrera, Rivera v. SLG Ramírez Vicéns, supra. Sin embargo, procede que analicemos

las cuantías concedidas por el foro primario aplicando el método de valoración de daños que adoptamos recientemente en Rodríguez *et al.* v. Hospital *et al.*, *supra*. Veamos cada una de las partidas por separado.

**Sra. Ruby Navarro Santiago:**

El Tribunal de Primera Instancia concedió a los peticionarios $35,000 por los daños sufridos por la señora Navarro Santiago antes de su muerte. A los fines de evaluar la razonabilidad de esta suma, y considerando que no existen dos casos exactamente iguales, examinemos algunos casos similares anteriores.

En Morales v. Hosp. Matilde Brenes, 102 DPR 188 (1974), confirmamos una sentencia del foro primario que concedió $39,000 a una víctima que tuvo que ser sometida a una intervención quirúrgica por sufrir de apéndice perforada y peritonitis generalizada como consecuencia de impericia médico-hospitalaria. En ese caso, la negligencia consistió en omitir realizar un diagnóstico diferencial que le hubiese permitido tratar a tiempo la condición severa de la paciente.

Conforme al método que adoptamos en Rodríguez *et al.* v. Hospital *et al.*, *supra*, debemos calcular el valor adquisitivo del dólar para el año 1974 y multiplicarlo por los $39,000 que se concedieron en ese caso para obtener el valor presente de esa cuantía. Para calcular el valor adquisitivo del dólar debemos dividir 100 entre el índice

de precios al consumidor para el 1974. El índice de precios al consumidor para ese año es 38.53, lo que significa que el valor adquisitivo del dólar es $2.60. Como resultado, el ajuste por inflación de los $39,000 es $101,400.[18]

Como segundo paso, nos corresponde actualizar esa cantidad para llevarla al año en que se dictó sentencia en el presente caso, es decir, al 2012. Para ello, debemos dividir el ajuste por inflación obtenido ($101,400) entre el valor adquisitivo del dólar para el 2012. El valor adquisitivo del dólar para ese año es $0.87, por lo que obtenemos como resultado $116,552, que constituye el valor presente de la suma que se concedió en *Morales*.[19]

Resulta importante destacar que en *Morales* la víctima no falleció y sufrió durante 3 días por la omisión del médico y del hospital en realizar un diagnóstico adecuado. Por el contrario, en el caso de la señora Navarro Santiago debemos considerar que ésta enfrentó las consecuencias nefastas de la negligencia de las enfermeras de BMA Caguas durante siete meses hasta su fallecimiento.

Por otro lado, en <u>Toro Aponte v. ELA</u>, 142 DPR 464 (1997), compensamos a una víctima con $140,000 por los

---

[18]El cómputo realizado para obtener el ajuste por inflación fue el siguiente: $39,000 x $2.60= $101,400.

[19]El índice de precios al consumidor para el 2012 es 115.21, por lo que el valor adquisitivo del dólar se computó de la siguiente forma: 100/115.21= $0.87. El cómputo para obtener el resultado de la actualización fue el siguiente: $101,400/$0.87= $116,552.

daños que sufrió a causa de la negligencia del médico y los facultativos del hospital donde le realizaron una cesárea y le dejaron una gasa quirúrgica en el abdomen. Ello ocasionó la perforación de la pared del intestino grueso, peritonitis e inflamación extensa en los tejidos adyacentes. Además, tuvo que someterse a dos cirugías adicionales, utilizar durante 10 meses un aditamento artificial para defecar, se afectaron severamente sus relaciones íntimas, se afectó su desempeño en actividades domésticas y recreativas, y estuvo afligida por un dolor intenso por más de 2 meses, entre otras cosas. A diferencia de la señora Navarro Santiago, la paciente sobrevivió. Según el método adoptado, el valor presente de la cuantía otorgada en *Toro Aponte* es $197,931.[20]

Posteriormente, en Sagardía de Jesús v. Hosp. Aux. Mutuo, 177 DPR 484 (2009), concedimos una indemnización de $50,000 a unos padres por los daños sufridos por su hijo durante 25 días por la negligencia de los facultativos del hospital en que se le atendió al nacer. La víctima en este caso sufrió un paro cardíaco que lo mantuvo en estado

---

[20]El índice de precios al consumidor para el 1997 es 81.14, por lo que el valor adquisitivo del dólar es $1.23. Luego, realizamos el cómputo siguiente para obtener el ajuste por inflación: $140,000 x $1.23= $172,200. Como segundo paso, dividimos el ajuste por inflación ($172,200) entre el valor adquisitivo del dólar para el 2012 ($0.87) y obtuvimos $197,931 como valor presente de la cuantía concedida en el 1997.

comatoso por varios días y falleció. El valor presente de la cuantía de $50,000 es $53,448.[21]

Resaltamos que, al igual que en el caso de la señora Navarro Santiago, la víctima en *Sagardía* estuvo en estado de coma por varios días a causa de los daños que le fueron infligidos. Sin embargo, contrario a lo ocurrido con el recién nacido en ese caso, la señora Navarro Santiago superó el estado comatoso y continuó sufriendo otras complicaciones como consecuencia de la impericia médico-hospitalaria durante aproximadamente cinco meses.

En torno a la cuestión del estado comatoso, en *Sagardía* el Tribunal de Apelaciones consideró el tiempo que el recién nacido estuvo en coma para reducir la cuantía que concedió el foro primario. Ello, por entender que ese tiempo no era compensable. En ocasión de revocar la determinación del foro apelativo y reinstalar la cuantía otorgada por el tribunal sentenciador, dictaminamos que "[e]l que una persona esté en estado de coma o sedada como consecuencia de un acto torticero, constituye una lesión corporal compensable como daño moral". Íd., pág. 511 (Énfasis suprimido). Destacamos que esa compensación no se fundamenta solo en la percepción de

---

[21]El índice de precios al consumidor para el 2009 es 107.81, por lo que el valor adquisitivo del dólar es $0.93. Luego, realizamos el cómputo siguiente para obtener el ajuste por inflación: $50,000 x $0.93= $46,500. Como segundo paso, dividimos el ajuste por inflación ($46,500) entre el valor adquisitivo del dólar para el 2012 ($0.87) y obtuvimos $53,448 como valor presente de la cuantía concedida en el 2009.

dolor, sino en la lesión que sufrió y que le mantiene en estado de coma o imperceptible al dolor. Íd.

Contrario a la norma pautada en *Sagardía*, en el caso de la señora Navarro Santiago el foro primario consideró los 40 días que ésta estuvo en estado de coma al momento de establecer la cuantía de $35,000 por sus sufrimientos y angustias mentales.

En Herrera, Rivera v. SLG Ramírez Vicéns, *supra*, compensamos con $600,000 a un joven por los daños morales que sufrió por la incapacidad total de su brazo izquierdo. Tal incapacidad surgió como corolario de la negligencia del médico que le atendió al nacer, quien hizo una maniobra que causó que el niño naciera con el brazo izquierdo paralizado y flácido, un hematoma en el pecho y una laceración en un dedo del pie izquierdo. El valor presente de la suma concedida en *Herrera* es $627,586.[22]

Conforme a las cuantías que se otorgaron en estos casos similares que hemos examinado, y a la luz de las circunstancias particulares del caso ante nos, determinamos que los $35,000 concedidos por el foro primario a los herederos de la señora Navarro Santiago por los sufrimientos y angustias mentales que ésta sufrió es

---

[22]El índice de precios al consumidor para el 2010 es 110.48, por lo que el valor adquisitivo del dólar es $0.91. Luego, realizamos el cómputo siguiente para obtener el ajuste por inflación: $600,000 x $0.91= $546,000. Como segundo paso, dividimos el ajuste por inflación ($546,000) entre el valor adquisitivo del dólar para el 2012 ($0.87) y obtuvimos $627,586 como valor presente de la cuantía concedida en el 2010.

una cuantía ridículamente baja. Consideramos que $200,000 es una suma que se ajusta más a las particularidades de este caso y es comparable con las cuantías otorgadas en los casos anteriores que revisamos. La compensación que concedemos es razonable ante la gravedad de los daños y perjuicios que enfrentó la señora Navarro Santiago a partir del 5 de septiembre de 2007, que se extendieron por siete meses y cuyo desenlace fue su muerte.

Recordemos que como corolario de las actuaciones negligentes de BMA Caguas, la señora Navarro Santiago sufrió una infiltración en su brazo izquierdo que le causó grave dolor y constante sangrado. Por consiguiente, tuvo que ser trasladada en ambulancia a una sala de emergencias, donde se le diagnóstico con síndrome de compartimiento causado por la infiltración y fue sometida a una cirugía de fasciotomía. Estuvo hospitalizada 71 días, tiempo en que tuvo que ser tratada por varias infecciones y complicaciones que incluyen, pero no se limitan, a una encefalopatía anóxica y un fallo respiratorio. De esos 71 días, estuvo 40 días en coma a causa de las lesiones graves que se le infligieron. Fue dada de alta del hospital, pero regresó a su hogar encamada, con una traqueotomía que le ayudaba a respirar y, posteriormente, tuvo que ser admitida al hospital en varias ocasiones. Tal como determinó el Tribunal de Primera Instancia, las actuaciones negligentes de BMA

Caguas provocaron el deterioro abismal de salud sufrido por la señora Navarro Santiago y fueron huellas indelebles que perduraron hasta su óbito.

**Sr. Luis Oscar Santiago Montañez**:

El Tribunal de Primera Instancia concedió $40,000 al señor Santiago Montañez por los sufrimientos y angustias mentales que sufrió tras el incidente de impericia médico-hospitalaria que causó la muerte de su cónyuge. En aras de determinar la razonabilidad de la referida cuantía, procedemos a examinar las sumas concedidas en varios casos similares anteriores.

En Pérez Cruz v. Hosp. La Concepción, 115 DPR 721 (1984), otorgamos $40,000 al cónyuge de un señor que acudió al hospital luego de sufrir un accidente automovilístico y falleció al día siguiente como consecuencia de impericia médico-hospitalaria. De acuerdo al método de valoración de daños que hemos adoptado, el valor presente de esa cuantía es $72,644.[23]

Asimismo, en SLG Rodríguez v. Nationwide, 156 DPR 614 (2002), confirmamos una cuantía de $65,000 concedida al cónyuge de una víctima que sufrió lesiones luego de que su vehículo fuera impactado por un camión. Contrario al caso

---

[23] El índice de precios al consumidor para el 1984 es 63.35, por lo que el valor adquisitivo del dólar es $1.58. Luego, realizamos el cómputo siguiente para obtener el ajuste por inflación: $40,000 x $1.58= $63,200. Como segundo paso, dividimos el ajuste por inflación ($63,200) entre el valor adquisitivo del dólar para el 2012 ($0.87) y obtuvimos $72,644 como valor presente de la cuantía concedida en el 1984.

del señor Santiago Montañez, el cónyuge en ese caso no tuvo que sufrir la pérdida de compañía de su esposo, toda vez que éste sobrevivió. De conformidad con el método que adoptamos, el valor presente de la cuantía concedida en *SLG Rodríguez* es $88,161.[24]

En <u>Vélez Rodríguez v. Amaro Cora</u>, 138 DPR 182 (1995), confirmamos la indemnización de $34,000 que otorgó el foro primario a la viuda de un causante que feneció en un accidente automovilístico. El valor presente de esa cuantía es $50,805.[25]

Debemos destacar que, a diferencia de lo ocurrido en los casos reseñados, el señor Santiago Montañez presenció el sufrimiento de su cónyuge y cómo ésta se aferraba a la vida durante siete meses. Además, el señor Santiago Montañez también tuvo que cuidar de ésta durante esos siete meses hasta su fallecimiento.

---

[24]El índice de precios al consumidor para el 2002 es 84.9, por lo que el valor adquisitivo del dólar es $1.18. Luego, realizamos el cómputo siguiente para obtener el ajuste por inflación: $65,000 x $1.18= $76,700. Como segundo paso, dividimos el ajuste por inflación ($76,700) entre el valor adquisitivo del dólar para el 2012 ($0.87) y obtuvimos $88,161 como valor presente de la cuantía concedida en el 2002.

[25]El índice de precios al consumidor para el 1995 es 77.08, por lo que el valor adquisitivo del dólar es $1.30. Luego, realizamos el cómputo siguiente para obtener el ajuste por inflación: $34,000 x $1.30= $44,200. Como segundo paso, dividimos el ajuste por inflación ($44,200) entre el valor adquisitivo del dólar para el 2012 ($0.87) y obtuvimos $50,805 como valor presente de la cuantía concedida en el 1995.

En consideración a las compensaciones concedidas en los casos similares anteriores que estudiamos, resulta forzoso concluir que la partida de $40,000 que otorgó el foro primario al señor Santiago Montañez es ridículamente baja. Estamos convencidos de que en este caso particular una cuantía de $80,000 es razonable.

**Luis Joel Santiago Navarro y Luis Oscar Santiago Navarro:**

El Tribunal de Primera Instancia otorgó a Luis Joel Santiago Navarro y Luis Oscar Santiago Navarro, hijos de la señora Navarro Santiago, una compensación de $15,000 a cada uno por sus sufrimientos y angustias mentales. Con el propósito de evaluar la razonabilidad de estas sumas, examinemos algunos casos similares anteriores.

En Roses v. Juliá, 67 DPR 518 (1947), confirmamos un dictamen del foro primario en el que concedió una suma total de $8,000 a los dos hijos de una señora que se lanzó de la azotea de la clínica para enfermos mentales en que estaba hospitalizada. El incidente desgraciado en el que falleció la señora ocurrió como consecuencia de la negligencia del personal de la clínica, quienes desatendieron a la paciente. Conforme al método de valoración de daños que adoptamos, el valor presente de la suma concedida en ese caso es $53,517.[26] Si consideramos la

---

[26] El índice de precios al consumidor para el 1947 es 17.17, por lo que el valor adquisitivo del dólar es $5.82. Luego, realizamos el cómputo siguiente para obtener el ajuste por inflación: $8,000 x $5.82= $46,560. Como segundo paso, dividimos el ajuste por inflación ($46,560)

cuantía otorgada por el Tribunal de Primera Instancia a cada hijo de la señora Navarro Santiago, obtenemos una suma total de $30,000 entre los dos, lo que no es comparable con el valor presente de la suma total concedida en *Roses* a los dos hijos de la causante.

De forma similar, en <u>Pérez Cruz v. Hosp. La Concepción</u>, *supra*, concedimos $15,000 al hijo de un señor que fue víctima de negligencia médico-hospitalaria tras sufrir un accidente automovilístico. El valor presente de esa cuantía es $27,241.[27]

Cabe resaltar que, contrario a los hechos ocurridos en los casos anteriores que analizamos, los hijos de la señora Navarro Santiago le acompañaron durante los siete meses en que fue sometida a varios tratamientos, estuvo hospitalizada en numerosas ocasiones y encamada en su hogar sin posibilidad de recuperarse. Incluso, Luis Joel se mudó a vivir con la causante para asistir a su padre en el cuidado de ésta.

Evaluadas las indemnizaciones otorgadas en los casos reseñados, concluimos que las cuantías de $15,000

_____

entre el valor adquisitivo del dólar para el 2012 ($0.87) y obtuvimos $53,517 como valor presente de la cuantía concedida en el 1947.

[27]El índice de precios al consumidor para el 1984 es 63.35, por lo que el valor adquisitivo del dólar es $1.58. Luego, realizamos el cómputo siguiente para obtener el ajuste por inflación: $15,000 x $1.58= $23,700. Como segundo paso, dividimos el ajuste por inflación ($23,700) entre el valor adquisitivo del dólar para el 2012 ($0.87) y obtuvimos $27,241 como valor presente de la cuantía concedida en el 1984.

otorgadas a cada hijo de la causante son ridículamente bajas. En su lugar, concedemos una cuantía de $30,000 a cada uno de los hijos.

**Rosalí Flores Rodríguez y Yarelis Vázquez:**

El Tribunal de Primera Instancia compensó a Rosalí Flores Rodríguez y Yarelis Vázquez, nueras de la señora Navarro Santiago, con las sumas de $15,000 y $10,000, respectivamente, por sus sufrimientos y angustias mentales. Evaluemos estas cuantías a la luz de las indemnizaciones concedidas en casos similares anteriores.

De entrada, reconocemos que no hemos identificado pronunciamientos de este Tribunal en el que se hayan concedido compensaciones a personas que hayan sufrido daños ante el sufrimiento y deceso de su suegra a causa de negligencia médico-hospitalaria. Sin embargo, en otras ocasiones se ha interpretado que en acciones instadas al amparo del Art. 1802 no existe límite en torno al grado de vínculo de lazo sanguíneo o afectivo que deba existir entre el causante y el que reclama daños por sus sufrimientos y angustias mentales. Véase Amadeo Murga, op. cit., 2da ed., pág. 304. Ello, toda vez que lo determinante es que el reclamante pruebe a satisfacción del tribunal que ha sufrido un daño moral apreciable. Íd.

Así, pues, en cuanto a los lazos afectivos que no involucran relaciones sanguíneas, en Zeno Molina v. Vázquez Rosario, 106 DPR 324 (1977), indemnizamos con la

suma de $10,000 a una tía de crianza por sus sufrimientos y angustias mentales ante el fallecimiento instantáneo de un joven cuyo automóvil fue impactado por un vehículo conducido negligentemente. Según el método de valoración de daños adoptado, el valor presente de esa cuantía es $25,862.[28]

En consecuencia, resolvemos que las cuantías concedidas por el Tribunal de Primera Instancia a Rosalí Flores Rodríguez y Yarelis Vázquez son ridículamente bajas. De la prueba desfilada y las determinaciones del foro primario se desprende que las nueras de la señora Navarro Santiago mantenían una relación familiar muy estrecha con ella y se afectaron emocionalmente de forma permanente y no pasajera ante su fallecimiento. Además, una de las nueras se mudó con su cónyuge al hogar de la causante para asistir al señor Santiago Montañez en el cuidado de ésta. Concluimos que, ante las particularidades de este caso, es razonable la suma de $25,000 para cada una de las nueras.

Finalmente, una revisión de las indemnizaciones otorgadas en los casos similares que hemos discutido y la aplicación de los preceptos jurídicos expuestos nos llevan

---

[28]El índice de precios al consumidor para el 1977 es 44.53, por lo que el valor adquisitivo del dólar es $2.25. Luego, realizamos el cómputo siguiente para obtener el ajuste por inflación: $10,000 x $2.25= $22,500. Como segundo paso, dividimos el ajuste por inflación ($22,500) entre el valor adquisitivo del dólar para el 2012 ($0.87) y obtuvimos $25,862 como valor presente de la cuantía concedida en el 1977.

a concluir que las partidas de daños concedidas por el Tribunal de Primera Instancia a los peticionarios son ridículamente bajas. En consecuencia, aumentamos las cuantías otorgadas por el foro primario en la forma que hemos expuesto.

## VI

Por los fundamentos que anteceden, revocamos el dictamen emitido por el Tribunal de Apelaciones y aumentamos las cuantías concedidas por el foro primario. Particularmente, resolvemos que el Tribunal de Apelaciones erró al excluir al cónyuge supérstite, señor Santiago Montañez, de la partida de daños concedida por los sufrimientos y angustias mentales que sufrió la señora Navarro Santiago antes de su muerte. Además, dictaminamos que los recurridos deben indemnizar a los peticionarios en la forma que disponemos a continuación: $200,000 por los daños sufridos por la señora Navarro Santiago antes de su muerte; $80,000 para el señor Santiago Montañez por sus sufrimientos y angustias mentales; $30,000 para Luis Joel Santiago Navarro; $30,000 para Luis Oscar Santiago Navarro; $25,000 para Rosalí Flores Rodríguez; y $25,000 para Yarelis Vázquez.

Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Luis Oscar Santiago Montañez *et al.*<br><br>     Peticionarios<br><br>          v.<br><br>Fresenius Medical Care *et al.*<br><br>     Recurridos | CC-2013-986 | *Certiorari* |

SENTENCIA

San Juan, Puerto Rico, a 6 de mayo de 2016.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se revoca el dictamen emitido por el Tribunal de Apelaciones y se aumentan las cuantías concedidas por el foro primario. Particularmente, se resuelve que el Tribunal de Apelaciones erró al excluir al cónyuge supérstite, señor Santiago Montañez, de la partida de daños concedida por los sufrimientos y angustias mentales que sufrió la señora Navarro Santiago antes de su muerte. Además, se dictamina que los recurridos deben indemnizar a los peticionarios en la forma que se dispone a continuación: $200,000 por los daños sufridos por la señora Navarro Santiago antes de su muerte; $80,000 para el señor Santiago Montañez por sus sufrimientos y angustias mentales; $30,000 para Luis Joel Santiago Navarro; $30,000 para Luis Oscar Santiago Navarro; $25,000 para Rosalí Flores Rodríguez; y $25,000 para Yarelis Vázquez.

Así lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez hace constar las siguientes expresiones:

"Concurro con el dictamen de una mayoría de este Tribunal, puesto que estimo correcto resolver que el Tribunal de Apelaciones erró al excluir al Sr. Luis Oscar Santiago Montañez, como cónyuge supérstite, de todo acceso a la partida de daños por sufrimientos y angustias mentales concedida a la Sra. Ruby Navarro Santiago. Valga señalar que, dicho dictamen tiene la limitada función de corregir el referido error, puesto que todo lo relativo a la partición del caudal hereditario de la

señora Navarro Santiago no es objeto de este litigio. Asimismo, estoy conteste con la conclusión a la que arriba este Tribunal con relación a que las cuantías concedidas a los demandantes por el Tribunal de Primera Instancia, y confirmadas por el foro apelativo intermedio, son ridículamente bajas.

Ahora bien, me veo forzada a disentir puesto que una mayoría de este Tribunal emplea, nuevamente, el método de valoración de daños adoptado en *Rodríguez et al. v. Hospital et al.*, 186 D.P.R. 889 (2012), el cual considero erróneo e injusto. En esa ocasión disentí del proceder mayoritario debido a que se adoptó una nueva fórmula de valoración de daños que militaba contra la uniformidad, el fluir de la economía y el sentido de justicia. Consecuentemente, opté por proponer como metodología aquella ilustrada por el Lcdo. Amadeo Murga en su obra *El valor de los de los daños en la responsabilidad civil*. Así pues, en concreto, expliqué los beneficios de utilizar el "Índice de Producto Bruto per Cápita de Puerto Rico", como base para calcular el valor presente de las cuantías concedidas en dictámenes anteriores. Argumenté que dicho indicador se ajustaba con mayor precisión a la filosofía que subyace el proceso de estimación de daños ya que en éste se contempla tanto la inflación de la moneda como el crecimiento en el estándar de vida.

En el caso de autos, al aplicar la fórmula según propuesta en mi Opinión Disidente en *Rodríguez*, partiríamos de unos importes más altos al ajustar las cuantías concedidas en casos similares previos al valor presente. Estimo que esto proporcionaría un marco de referencia adecuado para determinar las cuantías a ser concedidas debido a que éstas se ajustarían con mayor precisión al poder adquisitivo del dólar hoy en día. Sin duda alguna, tal proceder redundaría en un resultado beneficioso para los demandantes que solicitaron nuestra intervención. Reitero que el empleo de la metodología avalada por la mayoría de este Tribunal no propicia la certeza judicial a la que debemos aspirar al momento de enfrentarnos a este ejercicio de estimación de daños. Por tanto, disiento."

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo