Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| JOSÉ MANUEL FÉLIX VEGA<br><br>Apelado<br><br>v.<br><br>DR. TIMOTEO TORRES SANTIAGO Y FULANA DE TAL Y LA SLG COMPUESTA POR AMBOS; CENTRO MÉDICO DEL TURABO, INC., H/N/C HOSPITAL HIMA SAN PABLO DE CAGUAS, A Y B COMPAÑÍA DE SEGURO; C Y D, DEMANDADOS DESCONOCIDOS<br><br>Apelantes | KLAN202400281 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Caso número:<br>E DP2015-0164<br><br>Sobre:<br>Daños y Perjuicios, Impericia Médica |

Panel integrado por su presidente, el juez Bermúdez Torres, el juez Adames Soto y la juez Aldebol Mora.

Aldebol Mora, Juez Ponente

## S E N T E N C I A

En San Juan, Puerto Rico, a 16 de enero de 2025.

Comparece la parte apelante, Timoteo Torres Santiago, y nos solicita que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Caguas, el 14 de diciembre de 2023, notificada el 29 del mismo mes y año. Mediante dicho dictamen, el foro primario declaró Ha Lugar la demanda incoada por la parte apelada, José Manuel Félix Vega.

Por los fundamentos que exponemos a continuación, se confirma el dictamen apelado.

### I

El 3 de julio de 2015, José Manuel Félix Vega (Félix Vega o apelado) presentó una *Demanda* contra el doctor Timoteo Torres Santiago (Torres Santiago o apelante) y el Centro Médico del Turabo, Inc. h/n/c Hospital HIMA San Pablo (Hospital HIMA) sobre daños y

perjuicios e impericia médica.[1] En síntesis, Félix Vega alegó que, debido a una condición de próstata agrandada, el 26 de febrero de 2013, fue intervenido quirúrgicamente por el doctor Torres Santiago en el Hospital HIMA. Adujo que, al culminar la intervención, experimentó un sangrado profuso en la uretra por lo cual tuvo que ser intervenido nuevamente por Torres Santiago y ser transfundido con sangre. Arguyó que luego de haber sido dado de alta, el 5 de marzo de 2013 acudió a la oficina de Torres Santiago para la remoción del *foley catheter*. Planteó que, ese mismo día, se orinó de manera involuntaria mientras realizaba unas gestiones, razón por lo cual tuvo que acudir nuevamente a la oficina de Torres Santiago, quien le comentó que esto estaría ocurriendo por unas semanas. Por otro lado, alegó que, tras algunos incidentes de incontinencia, acudió al doctor Félix Mendoza Rosa el 10 de abril de 2013, el cual le expresó que no lo podía intervenir quirúrgicamente, pues empeoraría su condición. Así pues, indicó que acudió al doctor Luis Ambert, quien lo intervino quirúrgicamente colocándole un neuroestimulador. A pesar de lo anterior, Félix Vega alegó que no hubo mejorías en la incontinencia, por lo cual le imputó responsabilidad de sus daños al doctor Torres Santiago al ser negligente en sus actuaciones.

En respuesta, el 24 de agosto de 2015, Torres Santiago presentó su *Contestación a Demanda*.[2] En el aludido escrito, Torres Santiago realizó sus alegaciones responsivas y expresó que Félix Vega tenía una condición conocida como *bladder filling defect* que hacía que su vejiga no se llenara bien, lo cual equivalía a una incontinencia urinaria. Argumentó que, después de la endoscopía, en la prueba de *uroflow* se encontró evidencia de obstrucción urinaria, siendo esto sinónimo de incontinencia. Arguyó, además,

---

[1] Apéndice 1 del recurso, págs. 1-4.
[2] Apéndice 2 del recurso, págs. 5-9.

que entre las posibles complicaciones por el proceso quirúrgico se encontraba la posibilidad de incontinencia, asunto que fue reconocido en el consentimiento informado.

Celebrado el juicio en su fondo y aquilatada la prueba, el 14 de diciembre de 2023, notificada el 29 del mismo mes y año, el Tribunal de Primera Instancia emitió la *Sentencia* que nos ocupa, mediante la cual declaró Ha Lugar la demanda incoada por Félix Vega.[3] En particular, el foro apelado desglosó las siguientes determinaciones de hechos:

1. El demandante compareció[,] por primera vez[,] a la oficina del Dr. Torres el 12 de diciembre de 2012. En tal momento[,] tenía 69 años de edad y convivía con su pareja consensual[,] Sra. Clarivel Vélez[,] de 48 años de edad.

2. El demandante llegó a la oficina del Dr. Torres con una dificultad urinaria leve ("Mild urinary issue")[,] como flujo lento.

3. Un CT Scan previo a la visita al Dr. Torres, reveló una próstata hipertrófica. [De] [l]a evidencia estipulada surge que la próstata del paciente pesaba 30gm luego de la cirugía. Una próstata agrandada pesa de 80-150 gramos.

4. Ante tal presentación clínica, el Dr. Torres practicó una cistoscopía en el paciente. Antes de tal proceso[,] el Dr. Torres no llevó [a cabo] ningún análisis clínico o subjetivo[,] a parte *[sic]* de una prueba de orina. Esta cistoscopía no estaba indicada sin análisis previo en ese momento[,] pues es contrario a las guías de la Asociación Urológica Americana (AUA)[.]

5. Antes de la cistoscopía[,] debió haberse realizado un "International Prostate Sympto[m] Score["] (IPSS) y un "post void residual" (PVR)[,] pues se necesita tener un mejor entendimiento de la queja subjetiva del paciente y mejor indicación clínica antes de un procedimiento invasivo.

6. El mismo día de la cistoscopía (28 de diciembre de 2012), el Dr. Torres recomendó hacer una cirugía "transurethral resection of the prostate" (TURP) al demandante. El Dr. Torres no presentó al demandante ninguna otra alternativa de tratamiento ni discutió las complicaciones con el demandante. Lo anterior es un desvío del estándar médico aplicable.

---

[3] Apéndice 4 del recurso, págs. 26-39.

7. La cirugía TURP no estaba indicada e incumplió con el estándar de cuidado. Esto[,] pues[,] el IPSS score no se había hecho previo a la cistoscopía; tampoco había indicación para tal procedimiento; no hay documentación de tratamiento alternativo a la cirugía; no se discutieron los efectos secundarios de la cirugía.

8. No es hasta luego de tomada la decisión de llevar a cabo la cirugía que se lleva a cabo el IPSS score. El resultado del mismo mostró síntomas leves-moderados. Tal resultado abona al hecho de que la cirugía TURP no estaba indicada.

9. El paciente fue objeto de un análisis de flujo de orina "Uroflow". La descarga total de orina fue de 306cc, con un flujo lento. Una vejiga normal tiene una capacidad de aproximadamente 300cc[,] por lo que la cantidad de descarga en este caso fue un resultado normal.

10. El residual de orina del demandante fue de 60ml, lo que resulta ser normal para la edad del demandante de acuerdo a publicaciones del Colegio de Médicos de Familia[,] citando [a] la Revista Urológica.

11. A pesar de estar contra-indicada, el Dr. Torres llevó a cabo la cirugía TURP bajo anestesia el 26 de febrero de 2013. Se removieron 16 gramos de tejido de próstata[,] lo que significa que tal próstata de inicio tenía aproximadamente 46 gramos, pues de la evidencia surge que[,] luego de la intervención[,] la pr[ó]stata tenía 30 gramos. Para un paciente de 69 años[,] una próstata tiene aproximadamente 50 gramos. En dicha intervención, Torres dejó cierto tejido sin remover.

12. A pocas horas de tal cirugía, el paciente sufrió una hemorragia que requirió llevarlo nuevamente al quirófano para someterlo a una fulguración o cauterización de la próstata. La hemorragia fue de tal magnitud que el demandante fue objeto de una transfusión de sangre.

13. A los tres días de ambas cirugías, el demandante fue dado de alta con un foley.

14. Luego de varios días con dolor, el foley fue removido el 5 de marzo de 2013 en la oficina del Dr. Torres. Ese día, estando en una institución bancaria, el demandante se le salió el orín frente a los clientes. Un evento muy vergonzoso para el demandante.

15. El Dr. Torres informó al demandante que la incontinencia era temporera, sin embargo, este tenía que utilizar pañales de manera continua.

16. El 20 de marzo de 2013, el demandante sufrió otro sangrado[,] por lo cual tuvo que ir de emergencia al

hospital a recibir tratamiento. El próximo día, el Dr. Torres intervino nuevamente con el paciente.

17. Inconforme con el tratamiento brindado por el Dr. Torres y debido a que sus síntomas continuaban, el demandante visitó a otros urólogos. En primera instancia[,] el demandante visitó al Dr. Félix Mendoza por motivo de su incontinencia urinaria. El paciente tuvo un total de cinco (5) visitas con el Dr. Mendoza[,] quien le dio tratamiento farmacológico. Del expediente estipulado surge que el Dr. Mendoza recoge el uso diario de pañales por el paciente.

18. El demandante tenía que usar sobre cinco (5) pañales diarios desde la cirugía TURP.

19. Debido a la persistencia de la incontinencia, el Dr. Mendoza refirió al demandante al Dr. Luis Ambert para posible cirugía.

20. Luego de evaluado el paciente, el Dr. Luis Ambert llevó a cabo una cirugía para colocar un aparato "Interstim" al paciente para mejorar la incontinencia urinaria. El demandante describió el procedimiento como uno muy doloroso.

21. Luego de la colocación del Interstim (16 de abril de 2015), la condición del paciente mejoró en un 50%. Sin embargo, el paciente a[ú]n padece de incontinencia y tiene que utilizar de 2-3 pañales diarios.

22. En lugar de la cirugía TURP y según la presentación clínica del paciente, el estándar de cuidado correcto según la AUA era:

    a. Obtener un examen de PSA[;]
    b. Obtener [un] historial detallad[o] físico y el IPSS[;]
    c. Discutir con el paciente todas las opciones[;]
    d. Hacer un plan de tratamiento que tome en cuenta los síntomas subjetivos del paciente y los hallazgos clínicos[;]
    e. En primera instancia[,] se trata al paciente con medicamentos por varias semanas[;]
    f. Repetir el IPSS a ver si mejoraron los síntomas, a ver si se necesitan más exámenes[;]
    g. Hay tres estructuras a considerar para un paciente con disfunci[ó]n urinaria; la uretra, la uretra prostática y la vejiga[;]
    h. Si no hay mejoría con medicamentos, se evalúan individualmente las tres estructuras mencionadas, no s[o]lo la próstata[;]
    i. Si no hay mejoría, entonces se consideran procedimientos más invasivos.

23. La presentaci[ó]n clínica del paciente no requería intervención quirúrgica TURP.

24. El hecho de llevar a cabo un procedimiento no indicado desembocó en los problemas permanentes que ahora sufre el demandante[,] requiriendo tratamientos posteriores.

25. Los problemas del paciente no son provocados por una vejiga hiperactiva[,] pues la vejiga estaba normal ("base line") cuando el demandante fue[,] por primera vez[,] a visitar al Dr. Torres. No se realizó una urodinámica que demostrara tal hecho.

26. El demandante, *[sic]* se siente deprimido y se mantiene en su casa. El demandante recibió alrededor de cinco (5) terapias psicológicas a tales efectos. Fue referido a la psiquiatra[,] Dra. Nilsa Hernández[,] quien [le] dio medicamentos para [la] depresión y para conciliar el sueño.

27. El Dr. Stuart M. Diamond es urólogo de profesión y su capacidad como perito fue estipulada entre las partes.

28. Para fundamentar su opinión, el Dr. Diamond revisó el expediente del demandante en la oficina del demandado Dr. Torres, el expediente del demandante en el Hospital Hima-San Pablo de Caguas, los expedientes del demandante en las oficinas de los urólogos Dr. Luis Ambert y Dr. Félix Mendoza, así como las guías de la Asociación Americana de Urología.

29. El Dr. Puras y el Dr. Torres tienen una trayectoria juntos por más de 40 años y son socios en la facultad de medicina. Han sido miembros de la Junta de Directores de la Asociación Urológica de Puerto Rico[,] así como presidentes de la misma. El Dr. Puras ha sido perito del Dr. Torres anteriormente en casos de impericia.

30. El Dr. Puras no tuvo el beneficio de revisar el expediente del Hospital Hima-San Pablo al momento de redactar su informe pericial ni al momento de la vista en su fondo.[4]

El foro primario determinó que Torres Santiago debía pagar a Félix Vega la cantidad de doscientos mil dólares ($200,000.00), siendo ciento sesenta y cinco dólares ($165,000.00) en concepto de daños y treinta y cinco mil dólares ($35,000.00) por angustias mentales.

En desacuerdo, el 16 de enero de 2024, Torres Santiago presentó una *Moción Conjunta Solicitando Enmiendas y/o*

---

[4] Apéndice 4 del recurso, págs. 29-33.

*Determinaciones de Hechos Adicionales y de Reconsideración,*[5] a la cual Félix Vega se opuso.[6] Atendidos los planteamientos de las partes, el 21 de febrero de 2024, el foro *a quo* declaró No Ha Lugar lo solicitado por Torres Santiago.[7]

Inconforme, el 21 de marzo de 2024, la parte apelante acudió ante esta Curia mediante el recurso de epígrafe y señaló los siguientes errores:

> Erró el TPI al determinar que el Dr. Torres y su perito, Dr. Puras son "socios" cuando nunca lo han sido y su relación profesional se limita a que ambos han sido [p]rofesores de la Escuela de Medicina del Recinto de Ciencias Médicas de Puerto Rico.

> Erró el TPI al descartar, no considerar y omitir totalmente de las Determinaciones de Hechos de su *Sentencia* el testimonio de ambos, Dr. Torres y su perito, Dr. Puras, con una mención de una relación previa de "socios" inexistente entre ambos, máxime cuando esa prueba no desfiló ante el Honorable Tribunal de Instancia, y tampoco se explicó en la Sentencia el raciocinio de la determinación y que se tomaría tal acción.

> Erró el TPI en la apreciación de la prueba pericial y al determinar que el Dr. Torres se apartó de la mejor práctica de la Medicina cuando el procedimiento quirúrgico estaba indicado y el demandante tuvo una complicación inherente y advertida del procedimiento quirúrgico practicado.

> Erró el TPI en la apreciación de la prueba presentada, cometiendo error manifiesto al aquilatar toda la prueba presentada, lo que no representa el balance más justiciero y jurídico de la totalidad de la prueba presentada.

> Erró el TPI al incluir en su *Sentencia* Determinaciones de Hecho[s] sobre prueba que no desfiló en el juicio[,] según las notas del abogado que suscribe en la vista en su fondo de este caso.

> Erró el TPI en la apreciación de la prueba cuando los daños referidos son causa de condiciones preexistentes y/o consecuencia de complicaciones inherentes y advertidas sin nexo causal alguno a cualquier imputación de negligencia.
> Erró el TPI al otorgar una cuantía monetaria exageradamente alta y al utilizar sentencias no publicadas de tribunales de instancia como casos comparables para, justificar dicha cuantía.

---

[5] Apéndice 6 del recurso, págs. 40-70.
[6] Apéndice 7 del recurso, págs. 71-79.
[7] Apéndice 8 del recurso, pág. 82.

Evaluada la determinación apelada, el 2 de abril de 2024, emitimos una *Resolución* mediante la cual le otorgamos un término al Tribunal de Primera Instancia para que hiciera el cómputo matemático de valoración de daños concedidos en la *Sentencia* del 14 de diciembre de 2023. Ello, conforme al caso *Rodríguez et al. v. Hospital et al.*, 186 DPR 889 (2012). En atención a lo anterior, el 12 de abril de 2024, notificada el 15 del mismo mes y año, el foro primario emitió una *Sentencia Enmendada*, en cumplimiento con lo ordenado.

Posteriormente, el 12 de julio de 2024, la parte apelante presentó un *Alegato Suplementario*. Por su parte, el apelado compareció mediante *Alegato de la Parte Apelada* el 19 de agosto de 2024.

Con el beneficio de la comparecencia de las partes, así como con la transcripción de la prueba oral, procedemos a resolver.

**II**

**A**

Los actos y omisiones en que intervenga cualquier género de culpa o negligencia son fuentes de obligaciones que generan responsabilidad civil extracontractual. 31 LPRA sec. 2992.[8] Por ello, el Artículo 1802 del Código Civil de Puerto Rico de 1930 establece que, "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado [...]". 31 LPRA sec. 5141. La responsabilidad civil al amparo de esta norma requiere la concurrencia de tres elementos, a saber: (1) la ocurrencia de un daño; (2) que dicho daño hubiera surgido como resultado de un acto u omisión culposa o negligente del demandado y (3) la existencia de un nexo causal entre el daño sufrido y dicho acto u

---

[8] El derecho aplicable en el caso de autos se remite al Código Civil de Puerto Rico de 1930, 31 LPRA sec. 1 *et seq.* (derogado), toda vez que nos encontramos ante hechos ocurridos con anterioridad a la aprobación y vigencia del Código Civil de Puerto Rico de 2020, Ley Núm. 55-2020, 31 LPRA sec. 5311 *et seq.*

omisión. *Sucn. Mena Pamias et al. v. Meléndez et al.*, 212 DPR 758, 768 (2023); *Nieves Díaz v. González Massas*, 178 DPR 820, 843 (2010); *López v. Porrata Doria*, 169 DPR 135, 150 (2006). Las acciones por responsabilidad civil extracontractual "se distinguen porque la responsabilidad frente al perjudicado surge sin que le preceda una relación jurídica entre las partes". *Maderas Tratadas v. Sun Alliance*, 185 DPR 880, 908 (2012). En estos casos, la culpa o negligencia consiste en la falta de cuidado al no anticipar o prever las consecuencias de un acto, tal y como lo haría una persona prudente y razonable en iguales circunstancias. *Montalvo v. Cruz*, 144 DPR 748, 755–756 (1998). Siendo ello así, la norma exige que se actúe con el grado de cuidado, diligencia, vigilancia y precaución que las particularidades del asunto de que trate exijan. *Monllor v. Soc. de Gananciales*, 138 DPR 600, 604 (1995).

En *Rodríguez et al. v. Hospital et. al.*, 186 DPR 889, 900 (2016), se reiteró y recalcó que una acción para exigir responsabilidad profesional a un médico no es distinta a la de un caso ordinario de daños y perjuicios por negligencia al amparo del Artículo 1802 del Código Civil, *supra.* Por lo tanto, al igual que cualquier otra causa de acción por daños y perjuicios, la reclamación por impericia médica requiere que la parte demandante establezca por preponderancia de la evidencia, creída por el juzgador, que los actos de negligencia, falta de cuidado o impericia del médico causaron el daño reclamado. *Íd.*

En los casos de impericia médica es necesario que el promovente de la acción demuestre la ocurrencia de un acto médico culposo o negligente, la producción de un daño real y la relación causal entre el acto del médico y el daño sufrido. *Soto Cabral v. ELA*, 138 DPR 298, 308-309 (1995). De modo que le corresponde al demandante probar, mediante preponderancia de la prueba, que las acciones negligentes del médico fueron el factor que con mayor

probabilidad ocasionó el daño sufrido y establecer el vínculo causal requerido por el Artículo 1802 del Código Civil de Puerto Rico de 1930, *supra*. *Castro Ortiz v. Mun. de Carolina*, 134 DPR 783, 793 (1993); *Pagán Rivera v. Mun. de Vega Alta*, 127 DPR 538 (1990); *Torres Ortiz v. Plá*, 123 DPR 637 (1989); *Rodríguez Crespo v. Hernández*, 121 DPR 639, 650 (1988).

Sin embargo, en nuestra jurisdicción rige una presunción a favor del médico que sugiere que este haya observado un grado razonable de cuidado y atención en la administración del tratamiento médico y que los exámenes practicados al paciente hayan sido adecuados. Por ello, le corresponde a la parte demandante controvertir esta presunción con prueba que demuestre algo más que una mera posibilidad de que el daño se debió al incumplimiento del médico de su obligación profesional. La relación de causalidad no se puede establecer a base de una mera especulación o conjetura. *López v. Dr. Cañizares*, 163 DPR 119, 134-135 (2004); *Blás v. Hosp. Guadalupe*, 146 DPR 267, 324 (1998). *Santiago Otero v. Méndez*, 135 DPR 540, 549 (1994).

Al evaluar esta prueba, el tribunal debe considerar que en nuestro ordenamiento jurídico las normas mínimas de cuidado, conocimiento y destrezas que le son requeridas a los profesionales de la salud, en casos de alegada mala práctica profesional, son las de brindar a sus pacientes aquella atención que, "a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satisface las exigencias profesionales generalmente reconocidas por la profesión médica". *López v. Dr. Cañizares*, supra, pág. 133; *Santiago Otero v. Méndez*, supra.

Hay que tener presente que la negligencia del médico no se presume por el hecho de que el paciente haya sufrido un daño o que el tratamiento no haya sido exitoso. *López v. Dr. Cañizares*, supra;

*Rodríguez Crespo v. Hernández*, supra, pág. 650. Se ha dicho al respecto que, para establecer un caso prima facie de impericia médica, se tiene que presentar prueba sobre: (1) las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas; (2) demostrar que la parte demandada incumplió con estas normas en el tratamiento del paciente; y (3) demostrar que esta fue la causa de la lesión sufrida por el paciente. *Arrieta v. Dr. de la Vega*, 165 DPR 538, 548-549 (2005); *Medina Santiago v. Vélez*, 120 DPR 380, 385 (1988); *Rodríguez Crespo v. Hernández*, supra, pág. 650.

Lo anterior quiere decir que le corresponde a la parte demandante establecer, mediante prueba pericial, cuáles son los requisitos de cuidado y conocimiento científico requeridos por la profesión en un tratamiento determinado, las normas de conocimiento informado y la razón por la cual el médico demandado no cumplió con las mismas. *Rodríguez Crespo v. Hernández*, supra, págs. 650-651; *Medina Santiago v. Vélez*, supra, pág. 385. Conforme a la norma antes indicada, el médico solamente responde por los daños y perjuicios causados cuando actúa negligentemente, con descuido o cuando falta a la pericia profesional que exigen las circunstancias. *Ríos Ruiz v. Mark*, 119 DPR 816, 820 (1987); *López v. Dr. Cañizares*, supra, pág. 134.

**B**

Sabido es que el deber de indemnizar "presupone un nexo causal entre el daño y el hecho que lo origina, pues sólo se han de indemnizar los daños que constituyen una consecuencia del hecho que obliga a la indemnización". *López v. Porrata Doria*, supra., pág. 151, citando a *Estremera v. Inmobiliaria Rac., Inc.*, 109 DPR 852, 856 (1980). En *Riley v. Rodríguez de Pacheco*, 119 DPR 762, 805 (1987), nuestro máximo Foro, expresó que:

[L]a determinación de una compensación justa y razonable por los daños sufridos [es] una tarea que constituirá un reto aun para un Salomón del siglo XX. La apreciación humana valorativa de elementos que no son ostensibles y visibles sino tangibles [...] no está exenta de cierto grado de especulación. Aspiramos a que toda adjudicación sea razonablemente balanceada, esto es, ni extremadamente baja como tampoco desproporcionalmente alta. *Íd.* (Citas omitidas).

La responsabilidad civil por daños y perjuicios es precisamente el deber de resarcir al damnificado, otorgándole un valor económico al daño sufrido. El *resarcimiento o indemnización pecuniaria* consiste en atribuir a la persona perjudicada la cantidad de dinero suficiente para compensar su interés perjudicado. Al respecto, es norma asentada que la indemnización monetaria es como una subrogación real en que el dinero ocupará el lugar de los daños y perjuicios sufridos, así como una atribución pecuniaria que crea una situación patrimonial que equivale a la destruida por el daño causado. *S.L.G. v. F.W. Woolworth & Co.*, 143 DPR 76, 81 (1997).

A tenor con lo anterior, el que un tribunal conceda cuantías insuficientes tiene el efecto de menospreciar la responsabilidad civil a la que deben estar sujetos los actos negligentes. *Rivera v. S.L.G. Díaz*, 165 DPR 408, 430 (2005). Por el contrario, una valoración exagerada del daño tiene un efecto punitivo, que anteriormente no era reconocido por nuestro sistema de derecho. *Íd.* Los tribunales deben procurar una proporción razonable entre el daño causado y la indemnización concedida. *Íd.*

La cuantificación de los daños es una tarea discrecional que corresponde al Tribunal de Primera Instancia. *Urrutia v. A.A.A.*, 103 DPR 643, 647 (1975). Son sus jueces los que están en mejor posición para hacer dicha evaluación ya que tienen contacto directo con la prueba presentada. *Íd.* Al determinar el monto de una indemnización, el juzgador debe hacerlo sobre una estricta base de correspondencia con la prueba. *S.L.G. v. F.W. Woolworth & Co.*,

supra, pág. 81. Como bien apunta nuestro Tribunal Supremo, "con este ejercicio no pretendemos desarrollar una ciencia exacta pues, después de todo, lo que buscamos es un estimado, ya que no existe un sistema de computación con el que todas las partes queden satisfechas". *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 916-917 (2012); *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, 179 DPR 774 (2010).

En esta ardua tarea, aunque no existen dos casos exactamente iguales, resulta indispensable examinar las cuantías concedidas en casos similares. Sobre este particular, nuestro Máximo Foro ha opinado lo siguiente:

> [N]os vemos obligados a advertir a los jueces sobre la importancia de detallar en sus dictámenes los casos que se utilicen como referencia o punto de partida para la estimación y valoración de daños y el cómputo realizado para establecer las cuantías que se concedan. Este llamado a los jueces y las juezas cobra importancia ante la necesidad imperante de instruir a las partes y a los miembros de la profesión jurídica en torno al método que se utiliza en ese difícil y angustioso proceso de estimar y valorar los daños. Habida cuenta de que esa tarea lleva consigo cierto grado de especulación, es forzoso explicar qué casos se utilizan como referencia y cómo las cuantías concedidas se ajustan en esos casos anteriores al caso que el tribunal tiene ante su consideración. *Santiago Montañez v. Fresenius Medical*, 195 DPR 476, 493 (2016).

Luego de identificar un caso similar al que actualmente está bajo la consideración del juzgador, se debe calcular el valor presente de la indemnización a la fecha en que se dicta la *Sentencia*. Esto, por medio del método que utiliza el *Índice de Precios al Consumidor* (IPC). *Santiago Montañez v. Fresenius Medical*, supra, págs. 495-496. A saber, el IPC es preparado mensualmente por el Negociado de Estadísticas del Departamento del Trabajo y Recursos Humanos (DTRH) para medir los cambios en el costo de vida en Puerto Rico.[9] *Herrera Rivera v. SLG Ramírez–Vicéns*, supra, págs. 787-788;

---

[9] Véase, el Índice de Precios al Consumidor (IPC) concatenado y promediado desde enero 1984 hasta marzo 2023 en:
http://www.mercadolaboral.pr.gov/Tablas_Estadisticas/Otras_Tablas/T_Indice_Precio.aspx.

*Rodríguez et al. v. Hospital et al.*, supra, pág. 911. El citado caso *Santiago Montañez v. Fresenius Medical*, supra, no solo constituye un precedente a seguir, sino que es aleccionador, ya que, por medio de él, nuestro Tribunal Supremo brindó múltiples ejemplos concretos de los dos pasos esenciales del procedimiento.

Es preciso mencionar que, en dicho análisis, puede darse el caso que las cuantías resultantes sean muy bajas. Ello responde probablemente a que las partidas concedidas en la *Sentencia* comparable también lo eran, por lo que procedería aumentar la indemnización si las circunstancias particulares del caso ante el juicio del Tribunal de Primera Instancia lo justifican. *Santiago Montañez v. Fresenius Medical*, supra, págs. 496-497. Por igual, una vez el Tribunal de Primera Instancia cumple con el mandato jurisprudencial de nuestro Alto Foro, si alguna parte lo impugna, también debe proveer los casos en los que basa su contención, para que podamos ejercer nuestra función revisora. Como es sabido, los tribunales apelativos no debemos intervenir con la valoración de daños que realiza el foro primario, salvo cuando la cuantía concedida resulte ridículamente baja o exageradamente alta. *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465, 497-498 (2022); *Santiago Montañez v. Fresenius Medical*, supra, pág. 490; *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 203 (2013). Esto es así ya que ese ejercicio de valoración de daños involucra cierto grado de especulación y elementos subjetivos, tales como la discreción y el sentido de justicia y conciencia humana del juzgador de los hechos. *Sucn. Mena Pamias et al. v. Meléndez et al.*, supra., pág. 769; *Íd.*

Por consiguiente, la cuantificación necesaria y justa para compensar los daños queda en el juicio sano, la experiencia y discreción del juzgador. *Sucn. Mena Pamias et al. v. Meléndez et al.*, supra, pág. 769; *Concepción Guzmán v. A.F.F.*, 92 DPR 488, 502

(1965). Empero, señaladas y sometidas a nuestra consideración circunstancias comprobadas que ameritan una modificación de cuantía, procederemos a ello siguiendo los criterios mencionados. *Urrutia v. A.A.A.,* supra, pág. 648. Cuando una parte solicita la modificación de las sumas concedidas, ella está obligada a demostrar la existencia de circunstancias que lo ameriten. *Rodríguez Cancel v. A.E.E.*, 116 DPR 443, 451-452 (1985). De lo contrario, prevalece la norma de abstención en ausencia de pasión, prejuicio, error manifiesto o parcialidad. *Cruz Flores et al. v. Hosp. Ryder et al.*, supra; *S.L.G. Rodríguez v. Nationwide,* 156 DPR 614, 623 (2002); *Colón y otros v. K-mart y otros,* 154 DPR 510, 520 (2001); *Trinidad v. Chade,* 153 DPR 292, 291 (2001).

Por otro lado, cuando una parte solicite la modificación de la indemnización concedida por el foro de instancia, deberá demostrar que, en efecto, existen circunstancias que así lo justifican. *Albino v. Ángel Martínez, Inc.*, 171 DPR 457, 487 (2007). Asimismo, la mera alegación sobre la improcedencia de las compensaciones concedidas es insuficiente para que los foros apelativos las modifiquen. Solo cuando se nos acredite que la cuantificación de los daños es irrazonable procederemos a revisarla. De lo contrario, reiteramos la norma de abstención judicial para intervenir con la apreciación de la prueba que hizo el foro de instancia en ausencia de pasión, prejuicio, error manifiesto o parcialidad. *S.L.G. Rodríguez v. Nationwide*, supra.

De no existir algún error manifiesto, parcialidad o prejuicio en tal apreciación, no corresponde nuestra intervención. *Meléndez v. El Vocero de Puerto Rico*, 144 DPR 389 (1997); *Albino v. Ángel Martínez, Inc.*, supra. No obstante, si bien es cierto que no existen fórmulas matemáticas o científicas que nos indiquen cómo se justiprecia el dolor y el sufrimiento, ni "una tabla o computadora electrónica que recoja todos los elementos y premisas inarticuladas que nutren la

valoración del dolor físico y mental humano", consideramos que una indemnización que se ajuste a aquellas que concedimos anteriormente en casos similares reviste de razonabilidad *prima facie*, y no será alterada, salvo que las circunstancias particulares del caso ante la consideración del Tribunal así lo exijan. *Herrera, Rivera v. S.L.G. Ramírez Vicéns*, supra, pág. 791; *Urrutia v. A.A.A.*, supra, pág. 647.

## c

Cuando el conocimiento científico, técnico o especializado sea de ayuda al juzgador o a la juzgadora de los hechos para entender la prueba presentada en el juicio o para determinar un hecho que se encuentre en controversia, una persona testigo, capacitada como perito, podrá testificar en forma de opiniones o de cualquier otra manera. Regla 702 de Evidencia de Puerto Rico (Evidencia), 32 LPRA Ap. VI, R. 702. El Tribunal Supremo de Puerto Rico ha adoptado la siguiente definición sobre lo que es un *perito*; un perito es aquella persona que, a través de la educación o experiencia, desarrolló un conocimiento o destreza, sobre una materia determinada, por lo cual puede formar una opinión que sirve para ayudar al juzgador o a la juzgadora de los hechos. *S.L.G. Font Bardón v. Mini-Warehouse,* 179 DPR 322, 338 (2010), citando el *Black's Law Dictionary,* 8va ed., Minnesota, Ed. Thomson West, 2004, pág. 619.

Un testigo podrá ser cualificado como perito si posee conocimiento especial, destreza, experiencia, instrucción o adiestramiento para que sea considerado experto o perito en el asunto sobre el cual habrá de prestar testimonio. Regla 703 (a) de Evidencia, 32 LPRA Ap. VI, R. 703(a). Este conocimiento especializado, destreza, experiencia, instrucción o adiestramiento puede ser probado mediante cualquier evidencia admisible, incluyendo su propio testimonio. Regla 703 (b) de Evidencia, 32 LPRA Ap. VI, R. 703(b).

La Regla 702 de Evidencia, *supra*, establece que el valor probatorio del testimonio pericial dependerá, entre otros, de los siguientes factores:

(a) Si el testimonio está basado en hechos o información suficiente;

(b) si el testimonio es el producto de principios y métodos confiables;

(c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;

(d) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;

(e) las calificaciones o credenciales de la persona testigo[;] y

(f) la parcialidad de la persona testigo.

De igual modo, la precitada regla, dispone que la admisibilidad del testimonio pericial será determinada por el tribunal a la luz de los factores enumerados en la Regla 403 de Evidencia, 32 LPRA Ap. VI, R. 403.

**D**

Sabido es que este Tribunal Apelativo actúa, esencialmente, como foro revisor. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Es por ello que nuestra encomienda principal es examinar cómo los tribunales inferiores aplican el Derecho a los hechos particulares de cada caso. *Íd.* Cónsono con lo anterior, el desempeño de nuestra función revisora se fundamenta en que el Tribunal de Primera Instancia desarrolle un expediente completo que incluya los hechos que haya determinado ciertos a partir de la prueba que se le presentó. *Íd.* Es decir, nuestra función de aplicar y pautar el Derecho requiere saber cuáles son los hechos, tarea que corresponde, primeramente, al foro de instancia. *Íd.* Como foro apelativo, no celebramos juicios plenarios, no presenciamos el testimonio oral de los testigos, no dirimimos credibilidad y no

hacemos determinaciones de hechos. *Íd.* Esa es la función de los tribunales de primera instancia. *Íd.*

Por el contrario, al momento de analizar prueba documental, prueba pericial o testimonios de testigos ofrecidos mediante declaraciones escritas, estamos en la misma posición que el Tribunal de Primera Instancia. *Ortiz et al. v. S.L.G. Meaux,* 156 DPR 488, 495 (2002). Así, "el Tribunal Apelativo tendrá la facultad para adoptar su propio criterio en la apreciación y evaluación de la prueba pericial, y hasta para descartarla, aunque resulte técnicamente correcta". *Santiago Ortiz v. Real Legacy et al.,* 206 DPR 194, 219 (2021), citando a *González Hernández v. González Hernández,* 181 DPR 746, 777 (2011). Asimismo, es norma básica que las conclusiones de derecho son revisables en su totalidad por el foro apelativo. *Dávila Nieves v. Meléndez Marín,* supra, pág. 770. Ahora bien, como norma general, los tribunales apelativos aceptan como correctas las determinaciones de hechos de los tribunales inferiores, así como su apreciación sobre la credibilidad de los testigos y el valor probatorio de la prueba presentada en la sala. *Íd.,* pág. 771.

En nuestro ordenamiento jurídico no se favorece la intervención de los foros apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Sucn. Mena Pamias et al. v. Meléndez et al.,* 212 DPR 758 (2023); *Pueblo v. Hernández Doble,* 210 DPR 850 (2022); *Santiago Ortiz v. Real Legacy et al.,* supra. Ello, debido a que el foro de instancia está en mejor posición que un tribunal apelativo para llevar a cabo esta importante tarea judicial. *Dávila Nieves v. Meléndez Marín,* supra, pág. 771.

En consideración a la norma de corrección que cobija a las determinaciones realizadas por el Tribunal de Primera Instancia,

cuando una parte peticionaria señala errores dirigidos a cuestionar la apreciación o suficiencia de la prueba, la naturaleza del derecho apelativo requiere que esta ubique al foro revisor en tiempo y espacio de lo ocurrido en el foro primario. Ello se logra utilizando alguno de los mecanismos de recopilación de prueba oral, como lo son: (1) transcripción de la prueba, (2) exposición estipulada o (3) exposición narrativa. *Pueblo v. Pérez Delgado*, 211 DPR 654 (2023). Los tribunales de mayor jerarquía no pueden cumplir a cabalidad su función revisora sin que se le produzca, mediante alguno de estos mecanismos, la prueba que tuvo ante sí el foro primario. *Íd.*

Esbozada la norma jurídica, procedemos a aplicarla al recurso antes nos.

**III**

En su primer planteamiento de error, la parte apelante señala que incidió el Tribunal de Primera Instancia al determinar que este y su perito, doctor Puras, son "socios", pues la parte apelante alega que nunca lo han sido y su relación profesional se limita a que ambos han sido profesores de la Escuela de Medicina del Recinto de Ciencias Médicas de Puerto Rico. De igual forma, en su segundo señalamiento de error, la parte apelante señala que el foro sentenciador erró al descartar, no considerar y omitir totalmente de las Determinaciones de Hechos de su *Sentencia* el testimonio de este y su perito, pues arguye que existe una mención de una relación previa de "socios" inexistente entre ambos, máxime cuando no se desfiló prueba sobre ello en el juicio. No le asiste la razón. Nos explicamos.

Según reseñamos, en nuestro ordenamiento jurídico existe una norma de corrección que cobija a las determinaciones y apreciación de la prueba realizadas por el Tribunal de Primera Instancia, por lo que, en ausencia de pasión, prejuicio, parcialidad o error manifiesto, los foros apelativos otorgarán completa

deferencia y respeto a las determinaciones y la apreciación que realice el foro primario.[10]

En el caso de autos, surge de la transcripción de la prueba oral (TPO), que el perito doctor Puras testificó en cuanto a su relación con la parte apelante. En específico, a preguntas del abogado de la parte apelada, declaró que conoce a la parte apelante desde hace más de cuarenta años.[11] Testificó que fue socio de la parte apelante en algún momento mientras cursaban sus estudios en la escuela de medicina y que, en la actualidad, fungen como miembros de la aludida facultad.[12] Atestiguó que fue miembro de la Junta Directiva de la Asociación Urológica de Puerto Rico de manera conjunta con la parte apelante y que ha participado en eventos de índole social con este.[13] De igual forma, declaró que ha fungido como perito de la parte apelante en una de las demandas hechas contra dicha parte por impericia médica.[14]

Tomando en consideración el testimonio del mencionado perito doctor Puras, el derecho antes expuesto, y el hecho de que la parte apelante no objetó ni presentó prueba que rebatiera el testimonio vertido por dicho perito, concluimos que las determinaciones de hechos y la apreciación realizada por el Tribunal de Primera Instancia, referente a la relación de "socios" entre el doctor Puras y la parte apelante, están completamente sustentadas por la prueba presentada en el juicio. En ausencia de pasión, prejuicio, parcialidad o error manifiesto, damos completa deferencia al foro primario en sus determinaciones de hechos. Por consiguiente, no se cometieron los errores anteriormente mencionados.

---

[10] Véase, *Sucn. Mena Pamias et al. v. Meléndez et al.*, supra; *Pueblo v. Hernández Doble*, supra.

[11] Véase, Transcripción de la Prueba Oral (TPO), pág. 269, líneas 14-25.

[12] TPO, pág. 269, líneas 14-25.

[13] Íd., pág. 270, líneas 1-24.

[14] Íd. pág. 271, líneas 9-18.

Por otro lado, en su tercer señalamiento de error, la parte apelante señala que el foro sentenciador erró en la apreciación de la prueba pericial y al determinar que la parte apelante se apartó de la mejor práctica de la medicina, pues alega que el procedimiento quirúrgico estaba indicado y la parte apelada tuvo una complicación inherente y advertida del procedimiento quirúrgico practicado. Del mismo modo, en su cuarto señalamiento de error, la parte apelante indica que el Tribunal de Primera Instancia incidió en la apreciación de la prueba presentada, pues arguye que cometió error manifiesto al aquilatar toda la prueba sin crear un balance más justiciero y jurídico de la totalidad de la prueba presentada. A su vez, como quinto planteamiento de error, la parte apelante alega que el Tribunal de Primera Instancia erró al incluir en su *Sentencia* determinaciones de hechos sobre prueba que no desfiló en el juicio. En su sexto señalamiento de error, la parte apelante arguye que el foro *a quo* incidió en la apreciación de la prueba, pues alega que los daños referidos son causa de condiciones preexistentes y/o consecuencia de complicaciones inherentes y advertidas sin nexo causal alguno a cualquier imputación de negligencia.

Por estar relacionados entre sí, discutiremos los errores esbozados conjuntamente.

Como detallamos previamente, en nuestro ordenamiento jurídico los tribunales apelativos aceptarán como correctas las determinaciones de hecho de los tribunales inferiores, su apreciación sobre la credibilidad de los testigos y el valor probatorio de la prueba desfilada en la sala.[15] No obstante, cuando los tribunales apelativos deben analizar prueba pericial, estos se encuentran en la misma posición que el Tribunal de Primera Instancia, otorgándole la facultad para adoptar su propio criterio en

---

[15] Véase, *Sucn. Mena Pamias et al. v. Meléndez et al.*, supra; *Pueblo v. Hernández Doble*, supra.

la apreciación y evaluación de la aludida prueba, y hasta para descartarla, aunque resulte técnicamente correcta.[16] El valor del testimonio pericial dependerá, entre otras cosas, de: (a) Si el testimonio está basado en hechos o información suficiente; (b) si el testimonio es el producto de principios y métodos confiables; y (c) la parcialidad de la persona testigo.[17]

Luego de revisar sosegadamente la transcripción de la prueba oral y la *Sentencia*[18] apelada, colegimos que no le asiste la razón a la parte apelante en los planteamientos de error antes expuestos. Revisados *de novo* los testimonios periciales vertidos en el juicio, coincidimos con el Tribunal de Primera Instancia de que, conforme al testimonio del perito de la parte apelada doctor Diamond, el estándar de cuidado correcto, según el *American Urological Association* (AUA) para una persona que presentaba un flujo urinario lento es el siguiente: (1) Se obtiene el examen de sangre de *PSA* (Antígeno Prostático Específico); (2) Se obtiene todo el historial físico detallado y el cuestionario *IPSS* (Puntuación Internacional de los Síntomas Prostáticos) del paciente; (3) Basado en los resultados de ambos, se discute con el paciente los tratamientos disponibles para su cuadro de salud; (4) Conforme el consentimiento informado, se crea un plan para tratar los síntomas subjetivos y los hallazgos clínicos del paciente; (5) Por lo general, se recomienda comenzar a tratar al paciente con medicamentos; (6) Luego se repite el *IPSS* para determinar si hubo una mejoría en los síntomas subjetivos del paciente y si se considera realizar más exámenes al mismo; (7) Existen tres estructuras a considerar para un paciente con disfunción urinaria, estas son: (a) la uretra, (b) la uretra prostática y (c) la vejiga; (8) De no existir mejoría en el paciente, se tienen que

---

[16] Véase, *Ortiz et al. v. S.L.G. Meaux*, supra; *Santiago Ortiz v. Real Legacy et al.*, supra.
[17] Véase, Regla 702 de Evidencia, supra.
[18] Apéndice 4 del recurso, págs. 26-39.

evaluar individualmente sus estructuras; y si no existe algún tipo de mejoramiento se considera realizar procedimientos más invasivos.[19]

En el caso ante nuestra consideración, surge del expediente que la parte apelada mostraba una dificultad urinaria moderada, por un flujo urinario lento, cuando compareció a la oficina de la parte apelante por primera vez.[20] De la prueba desfilada en el juicio quedó demostrado que, la parte apelante, en vez de realizar en primer lugar un IPSS y un *post void residual* (PVR) para tener un mejor entendimiento de la molestia principal del apelado, es decir un flujo urinario lento, y poder brindarle opciones de tratamientos, optó por llevar a cabo de entrada una cistoscopía y luego el procedimiento de *transurethral resection of the prostate* (TURP).[21] De esta manera, la parte apelante se alejó de la mejor práctica de la medicina, pues llevó a cabo el procedimiento contraindicado, el TURP, a la parte apelada, a pesar de que esta solo tenía una dificultad urinaria leve, el cual desembocó en problemas permanentes en este, como la incontinencia, que le requirió tratamientos posteriores por otros profesionales de la salud.[22]

Este cuadro fáctico y el derecho antes expuesto nos llevan a concluir que la apreciación de la prueba y las determinaciones de hechos realizadas por el Tribunal de Primera Instancia quedan sustentadas por la prueba presentada en el juicio, por lo que los errores antes señalados no se cometieron.

En su séptimo y último planteamiento de error, la parte apelante plantea que el Tribunal de Primera Instancia erró al otorgar una cuantía monetaria exageradamente alta y al utilizar sentencias

---

[19] Véase, TPO, págs. 54-55.
[20] Íd., págs. 22-23, 85.
[21] Véase, TPO, págs. 37-39, 54-55, 86-87.
[22] Véase, TPO, págs. 37-39, 44-45, 54-55, 58-59, 86-87, 93-99.

no publicadas de tribunales de instancia como casos comparables para justificar dicha cuantía. No le asiste razón. Veamos.

De entrada, no encontramos en la jurisprudencia algún impedimento de utilizar sentencias no publicadas por parte de los juzgadores de los hechos para fundamentar la concesión de cuantías en daños. Conforme esbozamos, la cuantificación de los daños es una tarea discrecional que corresponde al Tribunal de Primera Instancia.[23] El Tribunal Supremo de Puerto Rico ha expresado que es de suma importancia que los jueces detallen en sus dictámenes los casos similares y las cantías que se utilicen como referencia o punto de partida para la estimación y valoración de daños, así como el cómputo realizado para establecer las cuantías que se concedan.[24]

En el caso ante nuestra consideración, el juzgador de los hechos emitió una *Sentencia* en la cual otorgó la cantidad de doscientos mil dólares ($200,000.00) a la parte apelada. La cantidad está comprendida de ciento sesenta y cinco mil dólares ($165,000.00) en concepto de daños y treinta y cinco mil dólares ($35,000.00) por angustias mentales.[25]

En su dictamen enmendado, el foro sentenciador fundamentó su valoración de los daños en los siguientes casos que involucran impericia médica en procedimientos quirúrgicos urológicos, tomando en consideración de igual forma, el valor adquisitivo del dólar: (1) *Carmona Díaz y otros v. Sepúlveda Abreu y otros,* KLAN0500133; (2) *Hernández Rodríguez et. als v. Torres Santiago et. als,* KLAN100758; y (3) *Dávila Benítez v. HIMA San Pablo de Caguas et. als,* E DP2006-005.

---

[23] Véase, *Urrutia v. A.A.A.*, supra.
[24] Véase, *Santiago Montañez v. Fresenius Medical*, supra.
[25] Véase, *Sentencia Enmendada* emitida por el Tribunal de Primera Instancia para el caso número E DP2015-0164 el 12 de abril de 2024, notificada el 15 de abril de 2024.

En primer lugar, debemos calcular el valor adquisitivo del dólar para el año de la *Sentencia* del caso *Carmona Díaz y otros v. Sepúlveda Abreu y otros,* supra (Caso Base), que fue decidido en el año 2007 y la cantidad allí concedida fue de ciento cincuenta mil dólares ($150,000.00). Para calcular el valor adquisitivo del dólar, debemos dividir cien (100) entre el índice de precios al consumidor para dicho mes y año, el cual era ciento dos puntos cuarenta y nueve (102.49), lo que significa que el valor adquisitivo del dólar era de noventa y ocho centavos ($0.98). Como resultado, el ajuste por inflación de los ciento cincuenta mil dólares ($150,000.00) es de ciento cuarenta y siete mil dólares ($147,000.00).

Ahora bien, la cantidad de ciento cuarenta y siete mil dólares ($147,000.00), como segundo paso, hay que actualizarla al año de la *Sentencia* en el caso ante nos, es decir, diciembre 2023. Para ello, se divide la cantidad de ciento cuarenta y siete mil dólares ($147,000.00) por el valor adquisitivo del dólar para el mes de diciembre de 2023, en este caso sería setenta y cuatro centavos ($0.74). Calculado lo anterior, se obtiene el valor actual de ciento noventa y ocho mil seiscientos cuarenta y ocho dólares con sesenta centavos ($198,648.60).

Por otro lado, sobre el segundo caso utilizado por el foro sentenciador, *Hernández Rodríguez et. als v. Torres Santiago et. als,* supra (Caso Base), que fue decidido en agosto de 2010 y la cantidad allí concedida fue de ciento treinta y siete mil dólares ($137,000.00). Para calcular el valor adquisitivo del dólar, en primer lugar, debemos dividir cien (100) entre el índice de precios al consumidor para dicho mes y año, el cual era de ciento diez punto cincuenta y siete (110.57), lo que nos da el valor adquisitivo del dólar de noventa centavos ($0.90). Luego de multiplicar el referido valor adquisitivo con la cuantía otorgada en el referido caso base se obtiene la cantidad de ciento veintitrés mil con trescientos dólares

($123,300.00). Para actualizar esta cuantía al año de la *Sentencia* en el caso ante nos, se debe dividir la cantidad de ciento veintitrés mil con trescientos dólares ($123,300.00) por el valor adquisitivo del dólar para diciembre 2023; es decir, setenta y cuatro centavos ($0.74). Esto equivaldría a la cantidad de ciento sesenta y seis mil seiscientos veintiún dólares con sesenta y dos centavos ($166,621.62).

Por último, en el tercer y último caso, *Dávila Benítez v. HIMA San Pablo de Caguas et. als*, supra (Caso Base), que fue decidido en abril 2009 y la cantidad allí concedida fue de noventa mil dólares ($90,000.00). Para calcular el valor adquisitivo del dólar, debemos dividir cien (100) entre el índice de precios al consumidor para dicho mes y año, el cual era de ciento seis punto setenta y tres (106.73), que nos da el valor adquisitivo del dólar de noventa y cuatro centavos ($0.94). Luego de multiplicar el referido valor adquisitivo con la cuantía otorgada en el caso se obtiene la cantidad de ochenta y cuatro mil seiscientos dólares ($84,600.00). Como esbozamos, para actualizar esta cuantía al año de la *Sentencia* en el caso ante nos, se debe dividir la cantidad de ochenta y cuatro mil seiscientos dólares ($84,600.00) por el valor adquisitivo del dólar para diciembre 2023; es decir setenta y cuatro centavos ($0.74). Esto equivaldría a la cantidad de ciento catorce mil trescientos veinticuatro dólares con treinta y dos centavos ($114,324. 32).

Debido a que el juzgador no se apartó de las cuantías otorgadas en los correspondientes casos, y en ausencia de pasión, prejuicio, error manifiesto o parcialidad, resolvemos que no se cometió el error señalado y damos deferencia al Tribunal de Primera Instancia. Por lo tanto, el séptimo señalamiento de error tampoco se cometió.

## IV

Por las razones que anteceden, confirmamos el dictamen apelado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones